COURT OF APPEALS OF VIRGINIA


Present:  Judges Willis, Bumgardner and Frank
Argued at Alexandria, Virginia


MARGO COLLADO
                                             OPINION BY
v.    Record No. 0438-99-4        JUDGE ROBERT P. FRANK
                                         SEPTEMBER 5, 2000
COMMONWEALTH OF VIRGINIA


             FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                    Stanley P. Klein, Judge

             J. Ronald Lynch (J. Ronald Lynch, P.C., on
             briefs), for appellant.

             Steven A. Witmer, Assistant Attorney General
             (Mark L. Earley, Attorney General, on brief),
             for appellee.


     Margo Collado (appellant) was convicted in a jury trial of

child abuse in violation of Code § 18.2-371.1.  On appeal she

contends:  1) the evidence was insufficient to prove she was the

criminal agent and that she intended to inflict serious injury,

2) the trial court erred in not granting a jury instruction that

stated she was required to have had an intent to cause the

injuries inflicted upon the victim, and 3) the trial court erred

in admitting, at sentencing, a letter setting forth other

incidents of child abuse.  We disagree and affirm the judgment

of the trial court.

## I.  BACKGROUND

Andrew and Andrea Adelman hired appellant, a professional daycare provider, to provide daycare services in her home for their daughter, Olivia, born November 27, 1997.  At 7:00 a.m. on April 27, 1998, Andrea Adelman delivered her five-month-old daughter, Olivia, to appellant's home.  Olivia's godmother, Sandra Wilger, was to pick Olivia up at noon.  Appellant spoke to Mrs. Adelman on the telephone at 11:00 a.m. and stated that Olivia had been crying and seemed to be having a "tough time."  When Mrs. Wilger arrived to pick Olivia up, Olivia was in her car seat taking a bottle, rather than in the basement with the other children.  Appellant explained to Mrs. Wilger that Olivia had been crying and that she did not want Olivia to wake the other children.  Appellant elaborated on Olivia's crying by saying she had shown her "true colors" that morning and had "quite a set of lungs on her."  Olivia seemed fine once in Mrs. Wilger's care and later for Mrs. Adelman.

Mrs. Adelman again delivered Olivia to appellant's home at approximately 7:00 a.m. the next day.  Once again, at approximately 11:00 a.m., appellant and Mrs. Adelman spoke on the telephone.  Appellant told Mrs. Adelman that Olivia had been crying.  Appellant complained that she had to rock Olivia to sleep.  Olivia was fine when Mrs. Wilger picked her up at 4:00 p.m., although appellant complained that she had been crying all day and needed to be held or rocked to sleep.

Mrs. Adelman delivered Olivia to appellant on the morning of Wednesday, April 29, 1998.  When Mrs. Wilger picked Olivia up in the afternoon, appellant told Mrs. Wilger that Olivia ate less and slept more that day.  Appellant told Mrs. Wilger that she intended to get Olivia on a schedule and that Olivia would have no choice in the matter.

On Thursday, April 30, 1998, Mrs. Adelman delivered Olivia to appellant at approximately 1:00 p.m.  Olivia was well at that time.  When Mrs. Adelman returned at 5:00 p.m., Olivia was in her car seat in the kitchen.  Olivia appeared to be sleeping, but as Mrs. Adelman spoke with appellant, she noticed Olivia's left arm and left leg began to simultaneously make jerking motions.  The unusual movements lasted approximately one minute.  When Mrs. Adelman commented that she had never seen Olivia do that before, appellant responded that Olivia was dreaming.  Appellant was on the telephone and seemed angry at the time.  Mrs. Adelman left with Olivia and returned home.

Olivia never regained consciousness from the time Mrs. Adelman retrieved her from appellant's care until she rushed her to the hospital approximately three hours later.  During the majority of this time, Mrs. Adelman assumed Olivia was asleep.  She began to get concerned, however, when she was unable to awaken the child and because the unusual jerking motion of Olivia's limbs continued periodically.  She decided to call the doctor, but first called appellant to ask if anything had

happened at the house that day.  Appellant said nothing had happened and suggested Mrs. Adelman call a doctor.  When Mrs. Adelman did so, Dr. Baugh instructed Mrs. Adelman to take Olivia to the hospital.

Dr. Baugh met Mrs. Adelman at Fairfax Hospital and examined Olivia.  He discovered retinal hemorrhages in Olivia's left eye and requested a CAT scan, which revealed a large subdural hematoma on the left side of the brain.  Dr. Baugh observed a bruise on Olivia's ear lobe that was less than twenty-four hours old.  Olivia was admitted to the intensive care unit of the hospital and later that night underwent brain surgery to relieve the pressure on her brain.  Dr. Baugh testified that this injury was "life threatening."

Dr. Baugh, an expert in shaken baby syndrome, expressed his opinion that Olivia would have been "knocked out" immediately after the trauma.  He also testified that Olivia's one-sided seizures were indicative of brain injury.  Dr. Baugh testified that Olivia is not likely to recover full vision in her left eye.  Cognitive impairment is an unknown, but Olivia is at risk for such impairment.  She is at risk for speech delay and for mental retardation.  Her greatest risks are in the visual and cognitive domain.

Dr. David Sideman testified that Olivia suffered retinal hemorrhages and that her condition was consistent with a child suffering from shaken baby syndrome, a term used to describe

traumatic injury to a small child who is shaken so hard that the head flops back and forth, causing severe acceleration and deceleration to the head and eye. He also testified that causing such an injury usually requires a very forceful kind of shaking, inconsistent with accidental injury.

Dr. Craig Futterman testified as an expert in both pediatric intensive care and shaken baby syndrome. He stated that when Olivia first arrived at the hospital, she was in "severe distress." Olivia suffered a severe neurological injury and was doing very poorly both neurologically and from a cardiovascular and respiratory standpoint. He described Olivia's injury as a subdural hematoma, which caused pressure on the brain by compressing brain tissue and shifting the location of brain tissue and structures in the brain. He opined that Olivia was the victim of shaken baby syndrome. Dr. Futterman, like Dr. Sideman, testified that this injury was caused by violent shaking that resulted in severe acceleration and deceleration injuries to the brain. Dr. Futterman explained that the force necessary to cause these head injuries was significant.

Dr. Futterman explained that the force of gravity experienced by a fighter pilot in a tight turn might be six and one half Gs, which could cause the pilot to black out, but that the force applied to a child's brain resulting in shaken baby syndrome is between nine and one half and 350 Gs. Dr. Futterman

also testified that Olivia would have had an immediate and obvious reaction to the forces that caused her injuries. She would have been unconscious and may have developed seizures. Dr. Futterman further testified that the one-sided seizures Olivia experienced were consistent with focal seizures, which are symptoms often caused by pressure being applied to the brain by a subdural hematoma.

In the CAT scans, Dr. Futterman detected the presence of an additional collection of fluid in the brain. This other fluid could have been produced by trauma, a congenital abnormality in the structure of the brain, an infection, or a cystic hygroma. Dr. Futterman testified that the likelihood of this older fluid contributing to the brain injury of April 30, 1998, was "zero." A full body x-ray taken of Olivia when she was admitted to the hospital revealed no injuries to her bones.

Fairfax Police Detective Irene Boyle interviewed appellant, who told her that when Olivia arrived at her home on April 30, she was "wide awake and perky." Appellant claimed she fed Olivia bottles of breast milk and that Olivia took a nap. Appellant also told Boyle that Olivia awoke later, had another bottle, and played until about 4:00 p.m., when she fell asleep. Appellant claimed Olivia remained asleep from that time forward. Appellant also claimed Olivia behaved normally throughout the day.

Initially, appellant told Detective Boyle that Olivia was sleeping normally in her car seat when Mrs. Adelman arrived and that nothing appeared to be wrong. When questioned further, however, she stated she noticed Olivia twitching and moaning when Mrs. Adelman arrived, and later admitted she saw the twitching prior to Mrs. Adelman's arrival. Appellant insisted that no one else was near Olivia while in her care that day and that Olivia was never out of her sight. Appellant denied hurting Olivia.

## II. ANALYSIS

In reviewing the sufficiency of evidence on appeal, "the appellate court must examine the evidence and all inferences reasonably deducible therefrom in the light most favorable to the Commonwealth, the prevailing party in the trial court." Commonwealth v. Jenkins, 255 Va. 516, 521, 499 S.E.2d 263, 265 (1998) (citations omitted). "We may not disturb the trial court's judgment unless it is 'plainly wrong or without evidence to support it.'" Barlow v. Commonwealth, 26 Va. App. 421, 429, 494 S.E.2d 901, 904 (1998) (quoting Beavers v. Commonwealth, 245 Va. 268, 282, 427 S.E.2d 411, 421 (1993)).

Furthermore, "[t]he credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995) (citations omitted). "In its

role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." Marable v. Commonwealth, 27 Va. App. 505, 509-10, 500 S.E.2d 233, 235 (1998) (citation omitted).

"When weighing the evidence, the fact finder is not required to accept entirely either the Commonwealth's or the defendant's account of the facts," but "may reject that which it finds implausible, [and] accept other parts which it finds to be believable." Pugliese v. Commonwealth, 16 Va. App. 82, 92, 428 S.E.2d 16, 24 (1993) (citations omitted).

Appellant contends she was not the criminal agent who inflicted the injury upon Olivia because no evidence proved the time when Olivia's symptoms first appeared or that Olivia was with appellant immediately before the symptoms appeared. Appellant contends the Commonwealth did not prove the injury was inflicted between 1:00 p.m. and 5:00 p.m. on April 30, 1998, because the symptoms of brain injury only occurred after Olivia was returned to her mother's custody. Appellant asserts that the left hand and leg movement seen at appellant's home were not seizure activity. Appellant further argues that the older hematoma in the brain was caused at a time when appellant had no access to Olivia.

The evidence belies appellant's position. Ms. Adelman testified that on the day of the injury, Olivia was in good

health when appellant assumed her care. Appellant acknowledged Olivia was "awake and perky" at that time. Appellant acknowledged no one else was near Olivia while in her care on the day of the injury. According to appellant, Olivia was never out of her sight that day.

Dr. Baugh testified Olivia would have been "knocked out" immediately after sustaining the injury to her brain. Dr. Futterman testified Olivia was the victim of shaken baby syndrome, an injury caused by violent shaking that results in severe acceleration and deceleration injuries to the brain. The intensity of such shaking would preclude an accidental shaking. He stated that Olivia would have had an immediate and obvious reaction to her injuries. She would have been unconscious and may have developed seizures.

When Ms. Adelman arrived at 5:00 p.m. to pick up Olivia, the baby appeared to be sleeping but her left arm and left leg were jerking. Appellant admitted the twitching began before Ms. Adelman arrived. Dr. Baugh testified that Olivia's one-sided seizures indicated brain injury.

Dr. Futterman also addressed the old hematoma. He opined it could have been caused by trauma, congenital abnormalities in the structure of the brain, or infection. None of the physicians attributed the present brain injury to the old hematoma.

Further evidence indicated appellant was upset with Olivia's crying and constant need for attention. Appellant was concerned that Olivia's crying woke up other infants in her care.

Appellant cites Christian v. Commonwealth, 221 Va. 1078, 277 S.E.2d 205 (1981), to support her sufficiency argument. Christian, however, underscores the Commonwealth's position. In Christian, the appellant had sole custody of her daughter until she sent the child to daycare on the morning of November 29, 1979. See id. at 1082, 277 S.E.2d at 208. A daycare worker discovered the child's injuries. See id. However, at least five people had an opportunity to handle the child before the child's injuries were discovered. See id. The Court wrote, "[W]here it appears that a criminal assault was made upon a child within a particular period of time, evidence which shows that the accused was sole custodian of the child during that period may be sufficient, standing alone, to prove criminal agency." Id. The Court concluded the evidence was insufficient to exclude a reasonable hypothesis that someone other than the appellant was the criminal agent because at least five people had the opportunity to handle the child from the time she left her mother until her injuries were discovered. See id. at 1083, 277 S.E.2d at 208.

In the present case, the fact finder could properly conclude the child was injured after 1:00 p.m., when the child

was delivered to appellant, and prior to 5:00 p.m., when Ms. Adelman picked up the child. Appellant concedes the child was in good health when she arrived and testified Olivia was in distress prior to Ms. Adelman's arriving at 5:00 p.m. Based on the medical testimony, the jury could conclude that the injury immediately rendered the child unconscious and caused the child's left arm and left leg to shake. Appellant further testified that Olivia was in her presence for the entire four-hour period and no one else was near Olivia during that time.

Under the Christian analysis, Olivia was criminally assaulted during the period appellant had sole custody and control of the child. Therefore, we find the evidence sufficient to support the jury's finding that appellant was the criminal agent who inflicted the life threatening injuries to Olivia.

Appellant next contends the Commonwealth was required to prove appellant intended to inflict the specific injury suffered by Olivia.[1] Appellant further maintains the trial court erred in not granting an instruction dealing with this element of proof.

---

[1] At trial, in objecting to Commonwealth's Instruction No. I, appellant argued the Commonwealth must prove appellant intended to cause serious injury. This issue was set forth in appellant's Questions Presented B and C. Yet, in her brief, appellant contends the Commonwealth was required to prove appellant intended to inflict the specific injuries sustained by Olivia.

Pursuant to Code § 18.2-371.1, the Commonwealth was required to prove beyond a reasonable doubt that appellant, a person responsible for Olivia's care, did by a "willful act" cause a "serious injury to the life or health of such child." Therefore, the Commonwealth had to establish that appellant willfully shook Olivia and that the shaking caused a serious injury to Olivia.

The requirement that the act be "willful" does not mean, as appellant suggests, that the Commonwealth was required to prove appellant intended to injure Olivia or specifically intended to injure Olivia's brain or to blind her left eye. Rather, as this Court has held:

> "Willful" generally means an act done with a bad purpose, without justifiable excuse, or without ground for believing it is lawful. The term denotes "'an act which is intentional, or knowing, or voluntary, as distinguished from accidental.'" The terms "bad purpose" or "without justifiable excuse," while facially unspecific, necessarily imply knowledge that particular conduct will likely result in injury or illegality.

---

Appellant's motion to strike, made after the conclusion of the Commonwealth's evidence, challenged whether the Commonwealth proved an intent to cause the child injury. Appellant's motion to set aside the verdict was based, in part, on the Commonwealth's failure to prove appellant intended the results of her actions. In appellant's amended motion, she contended the trial court should have struck the evidence because she did not intend the results of her actions, did not intend to injure the child's eyes and brain.

It is not clear whether appellant has abandoned her claim of intent to cause serious injury and has substituted, on appeal, an intent to inflict the specific injury to Olivia's brain and eyes. Because appellant's position is not supported by law on either point, we will not distinguish between them.

Ellis v. Commonwealth, 29 Va. App. 548, 554, 513 S.E.2d 453, 456 (1999) (citations omitted).

Therefore, the Commonwealth was required to prove only that appellant knew her conduct would likely result in serious injury.

The evidence satisfies the Commonwealth's burden of proving willfulness. Appellant, a professional daycare provider, shook a five-month-old infant so violently as to cause brain injury. Appellant's spoken intent to force Olivia to conform to her idea of an appropriate schedule would not justify shaking her, nor would the crying of a five-month-old infant justify such treatment. The jury was entitled to conclude from the evidence that five-month-old Olivia did not conform to appellant's expectations for behavior and appellant responded by brutally shaking her into submission. This finding is amply supported by the evidence and is not "plainly wrong."

Finding that an intent to cause a serious injury or any specific injury is not an element of the offense, we further find that the trial court did not err in refusing to grant an instruction on that issue.

Appellant's final contention is that the trial court erred in admitting into evidence during sentencing a letter from Mr. and Mrs. Ladwig, which related that their child suffered a "shaken baby syndrome" injury while in appellant's care. Assuming without deciding that the trial court erred in

admitting the Ladwigs' letter into evidence, we find that any error committed by the trial court was harmless. The trial court received a number of positive letters regarding appellant's abilities as a child care provider, and, in admitting the Ladwigs' letter into evidence, stated, "I'm going to consider it as a negative reference, the same way that I'm considering all the positive references, but I am not going to sentence your client for what she allegedly did to the Ladwigs' child."

We find, therefore, the trial court only viewed the Ladwigs' letter as a negative reference and did not consider it for the fact that appellant previously committed a similar offense.

Appellant further contends the trial court is bound by another judge's ruling that the Ladwigs' letter was inadmissible. This argument was not raised at trial. "The Court of Appeals will not consider an argument on appeal which was not presented to the trial court." Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998) (citation omitted). Rule 5A:18 requires that objections to a trial court's action or ruling be made with specificity in order to preserve an issue for appeal. See Campbell v. Commonwealth, 12 Va. App. 476, 480, 405 S.E.2d 1, 2 (1991) (en banc). Accordingly, Rule 5A:18 bars our consideration of this question on appeal. Moreover, the record does not reflect any reason to

invoke the "good cause" or "ends of justice exceptions" to Rule 5A:18.

For these reasons, we affirm the judgment of the trial court.

<u>Affirmed.</u>