COURT OF APPEALS OF VIRGINIA


Present:   Judges McClanahan, Haley and Petty
Argued at Chesapeake, Virginia


KRYSTALLYNN MAGNO
                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 1873-07-1                   JUDGE WILLIAM G. PETTY
                                                       DECEMBER 9, 2008
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Edward W. Hanson, Jr., Judge

        Steven P. Letourneau (John D. Hooker, Jr., and Associates, P.C.,
        on brief), for appellant.

        (Robert F. McDonnell, Attorney General; Rosemary V. Bourne,
        Assistant Attorney General, on brief), for appellee.


        The trial court convicted Krystallynn Magno of abuse and neglect of a child in violation of

Code § 18.2-371.1(A).  The court sentenced Magno to five years incarceration, with all but six

months suspended.  Magno appeals this conviction, contending that there was not sufficient

evidence to support her conviction.  Because we determine that the evidence was sufficient to

establish Magno's guilt, we affirm her conviction.

                                        I.

        On appeal, we review the evidence in the "light most favorable" to the Commonwealth.

Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003).  This principle requires

us to "discard the evidence of the accused in conflict with that of the Commonwealth and regard as

true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn

_____

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

therefrom." <u>Parks v. Commonwealth</u>, 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980) (emphasis and citation omitted).

When Magno left for work the morning of December 13, 2006, she left her seven-month-old son in the care of her boyfriend, Brandon Carter.[1] Around 9:30 in the morning, the baby vomited on himself and Carter took him to the kitchen sink to rinse the vomit off of the baby with hot water from the sink sprayer. The water –which was later estimated to be 150 degrees Fahrenheit – scalded the baby.

The baby began to scream, and his face immediately appeared red and "slimy" from the burn. Within minutes, he realized that he had also burned the baby's chest so badly that the skin was peeling off. Carter called Magno and told her that he had burned the baby's upper lip with a hot rag, but that it was not a severe injury and he was going to apply some ointment to the burn.[2] Magno called home several times during the day and could hear the baby "whining" over the phone. Carter told her nothing was wrong although he acknowledged that the baby was "whimpering" at the time.

Carter picked Magno up from work around 3:30 that afternoon, bringing the baby with him in the car. When Magno saw the baby, she fell to the ground and began crying, saying "Oh my God. What happened? What did you do? I thought you said it wasn't that bad." Magno testified that the baby looked "scary" when she saw him: his face was red and slimy, his chest was losing the top layer of skin, and his left eye was almost swollen shut.

---

[1] After a joint trial with Magno, Carter was also convicted of the abuse and neglect of a child in violation of Code § 18.2-371.1(A), and a panel of this Court recently affirmed his conviction. See <u>Carter v. Commonwealth</u>, No. 2235-07-1 (Va. Ct. App. Oct. 7, 2008).

[2] Carter testified he initially applied an antibiotic ointment after speaking with his mother and Magno later applied Vaseline.

Despite the baby's apparent injuries, Magno chose to take the baby home rather than the hospital. Although she expressed to Carter her desire to take her baby to the hospital immediately, Carter did not want "social services to get involved" and was concerned about "getting in trouble with the Navy." When asked why she did not take the baby to the hospital, despite her desire to do so and her own belief that she would not be in trouble with the authorities, Magno testified she did not do so because she cared about Carter. That evening, instead of taking the baby to the hospital, Magno applied Vaseline to the baby's face and took the sheets off of the baby's bed so his burns would not stick to them. Magno then sewed a patch on her naval uniform and fell asleep on a couch downstairs while Carter cared for the baby upstairs overnight. Carter testified the baby whimpered through the night.

The next morning, the burns looked worse and were scabbing over. Although Magno had formulated a plan to take the baby to the hospital whether Carter "like[d] it or not," instead of taking the baby to the hospital, Magno went to work and left the baby with Carter. She did not take the baby to his regular babysitter because she was afraid that her babysitter would contact the authorities due to the severity of the burns on the baby's face and chest. Magno apparently changed her mind at some point during the day and asked her work supervisor for time off to take her son to the hospital. Although Magno was advised at work to instruct Carter to take the baby to the hospital immediately and meet them there, Carter convinced her to come home instead. Eventually, she and Carter took the baby to the hospital shortly after noon that day. Hospital personnel contacted the police when they saw the baby's condition. Carter and Magno both told police that they had decided to treat the baby at home because they were afraid that police and social services would become involved.

A pediatric child abuse expert examined the baby at the hospital and testified at trial. The doctor stated that the baby had second-degree burns on his face and third-degree burns on his chest.

She testified that the injuries were consistent with the water being 150 degrees. She also explained that, at that temperature, the burn would have been "[n]early instantaneous," that the baby's skin would have blistered almost immediately, and that the baby would have been screaming. It would have been immediately obvious that the baby had been severely burned and needed medical treatment.

Delaying that treatment, the doctor explained, created "a very high risk of infection, of scarring, and also of pain." The doctor also stated that, "[i]n any child who has this severe burn, the risk could be morbidity and mortality, severe illness and/or death." The doctor pointed out that the application of Vaseline is not recommended because it holds heat in and worsens a burn. And, the doctor emphasized that the baby "would have been in pain throughout the day" and that anyone caring for the child would have known that.

Based on this evidence, the trial court convicted Magno, finding that upon seeing the baby's injuries she was obligated to provide care. The trial court also explicitly resolved any conflict of evidence relating to Magno's willful omission of providing medical care because of the fear of involving the police and child protective services in favor of the Commonwealth.

II.

Code § 18.2-371.1(A) states that a parent who "by willful act or omission or refusal to provide any necessary care for the child's health causes or permits serious injury to the life or health of [her] child shall be guilty of a Class 4 felony." On appeal, Magno argues that the evidence was not sufficient to prove that she "willfully refused to provide necessary medical care for her child."[3]

---

[3] Magno also argues that there was no evidence that the delay in seeking medical care "exacerbated the child's injuries or caused or permitted any greater or futher injury." However, this argument was not part of her motion to strike and thus not preserved below. Therefore, we decline to address it on appeal. See Rule 5A:18.

In reviewing the sufficiency of the evidence, an appellate court examines "whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt." United States v. Powell, 469 U.S. 57, 67 (1984). A reviewing court does not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (emphasis in original and citation omitted). Instead, the proper inquiry is "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008) (quoting Jackson, 443 U.S. at 319) (emphasis in original). These principles recognize that an appellate court is "not permitted to reweigh the evidence," Nusbaum v. Berlin, 273 Va. 385, 408, 641 S.E.2d 494, 507 (2007), because appellate courts have no authority "to preside *de novo* over a second trial," Haskins v. Commonwealth, 44 Va. App. 1, 11, 602 S.E.2d 402, 407 (2004).[4]

The willfulness requirement of Code § 18.2-371.1(A) does not mandate that the Commonwealth prove Magno intended to injure her baby by refusing to take him to the hospital. Collado v. Commonwealth, 33 Va. App. 356, 366, 533 S.E.2d 625, 631 (2000). Instead, the term "'[w]illful denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental.'" Mangano v. Commonwealth, 44 Va. App. 210, 214, 604 S.E.2d 118, 120 (2004) (quoting Ellis v. Commonwealth, 29 Va. App. 548, 554, 513 S.E.2d 453, 456 (1999) (internal

---

[4] This deferential standard of review "applies not only to the historical facts themselves, but the inferences from those facts as well." Crowder v. Commonwealth, 41 Va. App. 658, 663 n.2, 588 S.E.2d 384, 387 n.2 (2003). Thus, a fact finder may "draw reasonable inferences from basic facts to ultimate facts," Haskins, 44 Va. App. at 10, 602 S.E.2d at 406 (citations omitted), unless doing so would push "into the realm of *non sequitur*," Thomas v. Commonwealth, 48 Va. App. 605, 608, 633 S.E.2d 229, 231 (2006) (citation omitted).

quotation marks and citations omitted)). A "willful" act also implies "knowledge that particular conduct will likely result in injury or illegality." Ellis, 29 Va. App. at 554, 513 S.E.2d at 456.

Here, there was an abundance of evidence from which the trial court could conclude that Magno willfully refused to provide necessary medical care for her child. Magno testified that the baby looked "scary" when she first saw him after the injury. His condition was such that she sat on the ground and started crying. Despite her desire to take the baby to the hospital, Magno did not seek medical care due to Carter's concerns about getting in trouble. Her baby's condition worsened overnight and into the next day. Again, although her plan had been to take the baby to the hospital in the morning, she chose to leave the baby at home with Carter who had not only inflicted the burns but also lied to her about the severity of the burns. In sum, although Magno clearly appreciated the severity of her baby's injuries, she did not take the baby to the hospital or otherwise seek medical care, did not care for her baby all night, and repeatedly put her baby in the care of an irresponsible caretaker. Instead of taking necessary action to protect the well being of her child, she failed to act out of her concern for and misguided loyalty to Carter. As we stated in Carter v. Commonwealth, No. 2235-07-1 (Va. Ct. App. Oct. 7, 2008), Magno's "failure to care for the child" like that of her boyfriend, "put the child in grave danger and displayed a willful disregard for the ever worsening condition of the child." Id. at 6.

We cannot say that this evidence was so deficient that only an unreasonable fact finder could have concluded that Magno's conduct amounted to a willful refusal to provide medical care necessary to the health of her child.

### III.

Accordingly, we determine that the evidence is sufficient to support Magno's conviction.

Affirmed.