COURT OF APPEALS OF VIRGINIA

Present: Judges Chafin, Malveaux and Senior Judge Frank
Argued at Norfolk, Virginia

**UNPUBLISHED**

ANDREW C. STEPHENS, S/K/A
 ANDREW CHARLES STEPHENS

                                     MEMORANDUM OPINION[*] BY
v.      Record No. 1432-15-1        JUDGE MARY BENNETT MALVEAUX
                                           OCTOBER 25, 2016

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Timothy S. Fisher, Judge

      Jonathan P. Sheldon (Sheldon, Flood & Haywood, PLC, on briefs),
      for appellant.

      Aaron J. Campbell, Assistant Attorney General (Mark. R. Herring,
      Attorney General, on brief), for appellee.


Andrew C. Stephens ("appellant") was convicted of aggravated malicious wounding, in

violation of Code § 18.2-51.2. On appeal, appellant argues that the evidence was insufficient

because there was no evidence of an intentional or criminal act committed by appellant and there

were innocent explanations for the victim's symptoms. He further argues that the trial court erred

by not qualifying his witness as an expert in biomechanics. Finding no error, we affirm the trial

court.

## I. BACKGROUND

The facts of this case concern an injury to the two-and-a-half-month-old daughter of

appellant. Appellant provided the following narrative of the events of Friday, November 2, 2012

to Sunday, November 4, 2012 to Detective Jeff Senter of the Special Victims Unit of the

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Newport News Police Department and to Dr. Susan Lamb, a Child Abuse Pediatrics Fellow with the Children's Hospital of the King's Daughters ("CHKD") in Norfolk.

On Friday, November 2, 2012, appellant's wife, Amber Stephens ("mother"), left home for training with the National Guard at approximately 5:30 a.m. Appellant and his wife both later reported that their daughter, R.S., was in a normal state of health at the time mother left. A few days earlier, on Wednesday, October 31, 2012, R.S.'s godmother babysat her while her parents went out to dinner. R.S. spit up once during that period of time, but otherwise was fine. The next day, Thursday, November 1, 2012, R.S. was in the care of her mother, and acted a bit fussier than usual but fed normally and did not appear ill.

At 7:30 p.m. on Friday, November 2, 2012, appellant noticed that R.S. was gasping for breath after he fed her. Appellant flipped her over and started patting her back. R.S. went limp for a second and then made a "weird groaning sound" that she had not made before. Appellant sought help at the home of a neighbor, who called 911. R.S. was transported to Mary Immaculate Hospital, and after an evaluation by a nurse and a doctor, was discharged that night. Appellant was given specific instructions on feeding R.S.

The following day, Saturday, November 3, 2012, R.S. vomited after every feeding and was fussy all day. Appellant first called R.S.'s pediatrician's office and was advised to give her small amounts of Pedialyte. When R.S. continued to vomit, appellant took R.S. to Mary Immaculate Hospital. R.S. was evaluated and discharged that day, with appellant again given instructions on feeding.

R.S. woke up on Sunday, November 4, at 5:00 a.m. and was fussy. After appellant fed her, she threw up. R.S. then went limp, began groaning, and experienced breathing problems. Appellant called 911 and R.S. was transported by ambulance to Mary Immaculate Hospital,

where a nurse examined her and described the infant as having "seizure-like activity."  R.S. was then transferred to CHKD.

On November 5, 2012, Detective Senter spoke with appellant at CHKD.  Appellant told Senter that he had been alone with R.S. the entire weekend.  Senter asked during this first conversation with appellant if there any been any falls or accidents during the weekend.  Appellant stated that the only accident he remembered occurred one week before, when appellant had picked up R.S. from her crib and bumped her head on the light fixture hanging from the ceiling above the crib.  Senter received a voicemail from appellant the next day, stating that he had "remembered something" and "may have made a mistake."  Senter arranged to meet with appellant on November 14, 2012, and at that time appellant said that when R.S. was limp in his arms, he put her in his forearms and "had shaken her."  He demonstrated how he shook R.S. in his forearms to Senter.  He further stated that "he wasn't going to town on her" and "was scared."  He told Senter that he did not want to cause "any damage" when he was shaking her.

Dr. Lamb examined R.S. on November 5, 2012.[1]  During her examination, Dr. Lamb found a one-centimeter bruise on R.S.'s lower back.[2]  Dr. Lamb also noted that R.S. had a clavicle fracture.  An x-ray taken on November 4, 2012 revealed that the fracture occurred within the last ten days, as there were no signs of healing on the bone.  A review of R.S.'s CT scans and MRIs revealed that R.S. had bilateral subdural hemorrhages.  R.S. also had an ophthalmological examination that showed that she had multiple retinal hemorrhages, which occur when vessels rupture throughout the back of the eye.  She also had retinoschisis in her right eye, where two layers of her retina had separated and the opening had filled with blood.  A CT scan conducted

---

[1] At trial, Dr. Lamb was qualified as an expert in child abuse pediatrics.

[2] The staff at Mary Immaculate Hospital first noticed the bruise on R.S.'s back. Dr. Lamb did not see the restraints that were used to transport R.S. from Mary Immaculate Hospital to CHKD, but stated that she was "very familiar" with the type of transport that would have been used, and said that it would not affect the area where R.S. was bruised.

on November 9, 2012 revealed that just over a centimeter of R.S.'s brain had shrunk due to the death of brain tissue. Dr. Lamb noted that dead brain tissue does not rejuvenate.

Dr. Lamb diagnosed R.S. with abusive head trauma. She developed her diagnosis of abusive head trauma by speaking with the parents, reviewing R.S.'s medical history, asking about any possible accidents or medical conditions, and looking for other potential medical conditions. Dr. Lamb testified that the American Academy of Pediatrics defines abusive head trauma as a violent act that injures an infant's brain causing injury to the brain as marked by subdural hemorrhages. The doctor noted that this type of injury is caused by "rotational acceleration/deceleration forces." She explained that rotational acceleration forces cause tearing of the blood vessels and brain damage. Dr. Lamb stated that the spectrum of neurologic symptoms of abusive head trauma depends on how badly the brain was injured. The symptoms may include an individual becoming stunned or dazed, and having breathing problems or seizures. The onset of symptoms is immediate after the brain injury occurs, but symptoms may get progressively worse.

Dr. Lamb noted that there was nothing in R.S.'s medical history that could explain her various injuries. She testified that "in the absence of an accidental history . . . [or] a medical condition that would cause it, it [left] that this was an inflicted abusive head injury," as otherwise "there was no explanation for it." The last case in which Dr. Lamb saw similar injuries arose from a car accident involving a child strapped in a car seat. The type of force associated with R.S.'s injuries would be "a force well outside of normal parenting." Additionally, as R.S. was not yet walking or crawling, she could not have injured herself in such a way.

On November 5, 2012, mother reported to Dr. Lamb that she had an uneventful vaginal delivery of R.S. Mother did state that R.S. had been kept in the hospital after birth because mother had a certain type of bacteria and that R.S. was given antibiotics. Mother also told

Dr. Lamb that R.S. had been developing normally and growing at a healthy pace since birth. At a later follow-up visit on December 11, 2012, mother indicated that she had a "hard labor, . . . an episiotomy[,] and had rupture of the membranes for over 24 hours." Based on this history from mother, Dr. Dilustro, a neurosurgeon, indicated that there "was a chronic subdural that could of happened at birth." On cross-examination at trial, Dr. Lamb stated that Dr. Dilustro was part of R.S.'s treatment team and that she had reviewed his notes prior to testifying. Dr. Lamb testified that as R.S. was two and a half months old at that point, any injuries that had occurred at birth would have "resolved at that point."

On November 6, 2012, Dr. Lamb spoke with R.S.'s primary care doctor, Dr. Stephen Bolduc. Dr. Bolduc reported that there was some concern about an abnormality in one of R.S.'s eyes when she was two months old. His notes from a visit on October 10, 2012 reflect that R.S. had a broken blood vessel in her right eye at that time. However, his notes did not reflect nor did he remember seeing any "significant abnormality."

At trial, appellant called Dr. John Lloyd as a defense witness. Dr. Lloyd testified that he had a Ph.D. in ergonomics, with a specialty in biomechanics. He further testified that he had conducted a number of biomechanical studies on pediatric head and brain injury. During *voir dire* by the Commonwealth, Dr. Lloyd admitted that he did not have a medical degree and therefore had never examined children as part of a medical practice. Dr. Lloyd also admitted that he was charged with perjury in Florida because he had stated that he held a professorship that he did not in fact hold. He entered into a "deferred prosecution agreement" with the state of Florida and the charge was eventually *nolle prosequied*. The Commonwealth objected to Dr. Lloyd's qualification as an expert witness due to his unadjudicated perjury charge in Florida. The trial judge initially expressed some concerns regarding Dr. Lloyd's credibility. The court, however,

excluded Dr. Lloyd's testimony solely based on his lack of a medical degree, opining that this fact prohibited him from testifying as to causation of R.S.'s injuries.

Dr. Thomas Young, a forensic pathologist, testified for appellant at trial. Dr. Young had reviewed R.S.'s medical records and investigative records from law enforcement. Dr. Young testified that R.S.'s symptoms were due to a non-traumatic cause. Dr. Young stated that R.S.'s vomiting and breathing problems were due to an "apparent life-threatening event." He testified that such an event could occur for "no apparent reason" and does not have to be "due to trauma." Dr. Young explained that an apparent life-threatening event could lead to deprivation of blood flow to the head, which could cause the kind of symptoms experienced by R.S. He further testified that R.S.'s bruise and clavicle facture could have been caused by non-abusive means, possibly from the handling of the infant in the hospital. On rebuttal, Dr. Lamb testified that an apparent life-threatening event would "certainly not" explain the constellation of injuries that R.S. experienced. She stated that simple brain swelling due to an apparent life-threatening event would not explain R.S.'s retinal hemorrhages or retinoschisis. Additionally, she explained that R.S.'s limited pauses in breathing, as described by appellant, would not cause R.S.'s subdural hemorrhages, retinal hemorrhages, clavicle fracture, or bruise.

Amber Stephens was called as a witness for appellant at trial. She testified that she never observed appellant show anger towards R.S. She also said that R.S. threw up twice in the week prior to November 2, 2012 and that she had not previously vomited before. Seven character witnesses also testified on appellant's behalf. They testified that he was honest and trustworthy, and attentive and loving to R.S.

At the conclusion of the trial, the jury found appellant guilty of aggravated malicious wounding, in violation of Code § 18.2-51.2. Appellant was sentenced to twenty years in prison, with ten years suspended. Appellant appeals his conviction to our Court.

II. ANALYSIS

A. Sufficiency of the Evidence

On appeal, appellant argues that the evidence was insufficient to support his conviction of aggravated malicious wounding. First, appellant contends that there was no evidence that R.S.'s symptoms were caused by abuse, and also that there were other reasonable hypotheses of innocence, or alternate plausible explanations for R.S.'s symptoms, other than abuse. Second, appellant also asserts that, even if R.S.'s symptoms were caused by abuse, there was no evidence that he was the abuser. Finally, appellant claims that even if he caused the trauma to R.S., there is no evidence that he acted with malice.

"When reviewing a challenge to the sufficiency of the evidence to support a conviction, this Court views the evidence in the light most favorable to the Commonwealth as the prevailing party below, granting to it all reasonable inferences drawn from that evidence." Burnette v. Commonwealth, 60 Va. App. 462, 475, 729 S.E.2d 740, 745 (2012). When considering the sufficiency of the evidence on appeal, "a reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Crowder v. Commonwealth, 41 Va. App. 658, 663, 588 S.E.2d 384, 387 (2003) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)). We ask only "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008) (quoting Jackson, 443 U.S. at 319). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319.

### 1. Exclusion of Reasonable Hypotheses of Innocence

We first address appellant's argument that there were other reasonable hypotheses of innocence and no evidence that R.S.'s symptoms were definitively caused by abuse. "Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." Coleman v. Commonwealth, 226 Va. 31, 53, 307 S.E.2d 864, 876 (1983). "The statement that circumstantial evidence must exclude every reasonable theory of innocence is simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt." Commonwealth v. Hudson, 265 Va. 505, 513, 578 S.E.2d 781, 785 (2003). Thus, the determinative question on appeal is "whether a reasonable jury, upon consideration of all the evidence, could have rejected" appellant's alternate theories and found him guilty of the offenses charged, beyond a reasonable doubt. Id. "When a jury decides the case, Code § 8.01-680 requires that 'we review the jury's decision to see if reasonable jurors could have made the choices that the jury did make. We let the decision stand unless we conclude no rational juror could have reached that decision.'" Crowder, 41 Va. App. at 662, 588 S.E.2d at 386 (quoting Pease v. Commonwealth, 39 Va. App. 342, 355, 573 S.E.2d 272, 278 (2002) (*en banc*)). "Merely because defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded." Miles v. Commonwealth, 205 Va. 462, 467, 138 S.E.2d 22, 27 (1964). "By finding the defendant guilty, therefore, the factfinder 'has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.'" Haskins v. Commonwealth, 44 Va. App. 1, 9, 602 S.E.2d 402, 406 (2004) (quoting United States v. Kemble, 197 F.2d 316, 320 (3d Cir. 1952)).

Here, the evidence, viewed in the light most favorable to the Commonwealth, was sufficient to permit the jury to conclude that the evidence did not contain a reasonable theory of innocence. Dr. Lamb, after examining R.S. and reviewing her medical records, diagnosed the infant with abusive head trauma. Dr. Lamb found that R.S. had sustained subdural and retinal hemorrhages, and had retinoschisis in her right eye. R.S. also had a bruise on her back and a fractured clavicle. Dr. Lamb stated that there was nothing in R.S.'s prior medical history that could explain these various injuries, and there were also no reported accidents that could explain them. Although appellant's expert, Dr. Young, testified that R.S.'s symptoms were due to a non-traumatic cause, an apparent life-threatening event, Dr. Lamb testified in rebuttal that such an event would not explain the constellation of injuries that R.S. experienced. "Conflicting expert opinions constitute a question of fact" for the fact-finder. Riner v. Commonwealth, 268 Va. 296, 329, 601 S.E.2d 555, 574 (2004) (quoting Mercer v. Commonwealth, 259 Va. 235, 242, 523 S.E.2d 213, 217 (2000)). "[I]t is within the province of the finder of fact . . . 'to assess the credibility of the witnesses and the probative value to be given their testimony.'" Id. at 329-30, 601 S.E.2d at 574 (quoting Mercer, 259 Va. at 242, 523 S.E.2d at 217). Here, the jury, in finding appellant guilty, credited the testimony of Dr. Lamb as opposed to that of Dr. Young, as was proper in its role as fact-finder. Based on the evidence in the record, we find no reason to disturb the jury's determination.

Appellant also posits several alternative theories as to the origin of R.S.'s injuries. He suggests that R.S.'s injuries could have resulted from a subdural hemorrhage at birth, as noted by a neurosurgeon who was part of R.S.'s treatment team. However, on cross-examination, Dr. Lamb stated that she had reviewed the neurosurgeon's notes and that any injuries that could have occurred at birth would have been resolved at the time of the incident. Appellant further contends that R.S.'s symptoms could have been caused by medical personnel handling R.S.

- 9 -

Dr. Lamb testified that while she did not personally see the restraints used to transport R.S. from Mary Immaculate Hospital to CHKD, these restraints, with which she was familiar, would not affect the area where R.S. was bruised. Appellant also suggests that R.S.'s symptoms started earlier than the weekend of November 2, as R.S.'s primary care doctor noted that she had a broken blood vessel on October 10, 2012, about a month prior to the weekend where she was alone with appellant. Dr. Lamb discussed this abnormality with the primary care doctor, who did not remember or note it being significant. Dr. Lamb reviewed R.S.'s medical history and spoke with the primary care doctor prior to making her diagnosis.

We find that a rational juror could have credited Dr. Lamb's testimony and concluded that the subdural hemorrhages were caused by recent trauma. Further, a rational juror could have found that the bruise was not caused by medical personnel and that any prior eye injury was not a part of the current injuries suffered by R.S. Therefore, the jury did not err in finding that the evidence did not contain a reasonable theory of innocence.

## 2. Appellant Was the Cause of the Injuries

Appellant next argues that even if there was evidence of abuse, there was no evidence that he was the abuser. This argument is also without merit. Appellant claims that both mother and R.S.'s godmother were each alone with R.S. for periods of time "at the time of onset of symptoms." Contrary to this assertion, the evidence established that R.S. vomited once on Wednesday, October 31, 2012 in the presence of her godmother. The next day, she appeared fussy but not ill while in the care of her mother. On Friday, November 2, at the time mother left, R.S. was in a normal state of health. Appellant himself admitted that he was alone with R.S. from Friday, November 2, 2012 through Sunday, November 4, 2012. On Sunday, November 4, when R.S. arrived at Mary Immaculate Hospital she was experiencing seizure-like activity. Dr. Lamb examined R.S. on November 5, 2012, and reported that R.S. had sustained subdural

hemorrhages, retinal hemorrhages, and retinoschisis, caused by abusive head trauma. At trial, Dr. Lamb testified that the onset of symptoms of abusive head trauma is immediate and noticeable after the brain injury occurs. Additionally, appellant told Detective Senter that he had shaken R.S. in his forearms. Here, the evidence supported the jury's conclusion that appellant was the cause of R.S.'s abusive head trauma. See Collado v. Commonwealth, 33 Va. App. 356, 365, 533 S.E.2d 625, 630 (2000) (finding evidence sufficient where medical evidence established that child was "criminally assaulted during the period appellant had sole custody and control of the child"). In this case, despite appellant's contentions, the jury was entitled to find that the evidence excluded all hypotheses other than abusive head trauma and that appellant was the cause of such trauma.

### 3. Proof of Malice

Appellant further argues that the record is devoid of any evidence proving that even if he caused the trauma to R.S., he acted with malice. A conviction for aggravated malicious wounding under Code § 18.2-51.2 requires a finding that the accused acted with malice. "Malice inheres in the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will. It may be directly evidenced by words, or inferred from acts and conduct which necessarily result in injury." Hernandez v. Commonwealth, 15 Va. App. 626, 631, 426 S.E.2d 137, 140 (1993) (quoting Dawkins v. Commonwealth, 186 Va. 55, 61, 41 S.E.2d 500, 503 (1947)). "Whether malice existed is a question for the fact finder." Robertson v. Commonwealth, 31 Va. App. 814, 823, 525 S.E.2d 640, 645 (2000). "A trier of fact may infer that a person intends the natural consequences of his or her acts." Hernandez v. Commonwealth, 12 Va. App. 669, 672, 406 S.E.2d 398, 400 (1991). "In determining the probable consequences of an aggressor's actions and his or her intent to achieve those consequences, the comparative weakness of the victim and the strength of the aggressor may be considered." Webber v.

Commonwealth, 26 Va. App. 549, 565, 496 S.E.2d 83, 90 (1998) (quoting Campbell v. Commonwealth, 12 Va. App. 476, 485, 405 S.E.2d 1, 5 (1991) (*en banc*)).

Appellant was the adult caregiver of his two-and-a-half-month-old daughter. Appellant admitted to Detective Senter that he had shaken R.S. in his forearms, but stated that he "wasn't going to town on her" and "was scared." He initially withheld this information from Senter, and only later told him after stating that he "may have made a mistake." Dr. Lamb testified that the force associated with the types of injuries R.S. had would be "well outside of normal parenting" and that the last case she saw with similar injuries was that of a child in a car accident. She diagnosed R.S. with abusive head trauma and noted that a centimeter of R.S.'s brain had shrunk due to the death of brain cells. On this evidence, we cannot say that the jury's finding of malice was plainly wrong or without evidence to support it.

Reviewing the evidence in whole, we hold that it was sufficient to exclude appellant's alternate hypotheses of innocence. Additionally, the evidence was sufficient to prove that appellant was the cause of R.S.'s trauma and that he acted with the requisite malice.[3]

### B. Qualification of Expert Witness

Appellant also alleges the trial court erred in not qualifying Dr. Lloyd as an expert witness in biomechanics.[4] Appellant contends that not qualifying Dr. Lloyd as an expert was error by the trial court because he possessed knowledge regarding the field of biometrics that could have refuted much of Dr. Lamb's testimony. On appeal, we cannot address this issue, as

---

[3] On brief, appellant cites several articles questioning the validity of "shaken baby syndrome/abusive head trauma" diagnoses. As these sources were never presented at trial, we do not consider them on appeal. See Rule 5A:18.

[4] As part of his argument under this assignment of error, appellant contends that the trial court abused its discretion in excluding Dr. Lloyd's testimony "due to a previous, unrelated allegation of perjury." However, the record refutes this assertion. The trial court specifically ruled that it would not allow Dr. Lloyd to testify because he was not a medical doctor and therefore could not opine as to the cause of R.S.'s injuries.

appellant did not make a sufficient proffer of the witness' testimony at the time the trial court sustained the objection to Dr. Lloyd's qualification as an expert witness.

"Whether to permit a witness to qualify as an expert on a given subject matter is an issue submitted to the discretion of the trial court . . . ." Conley v. Commonwealth, 273 Va. 554, 560, 643 S.E.2d 131, 134 (2007). "[W]hen evidence is excluded, the proponent must proffer for the record the nature of the expected evidence in order to preserve the ruling for appeal. Without such a proffer, the appellate court has no basis to determine whether the aggrieved party has been prejudiced by the ruling." Durant v. Commonwealth, 35 Va. App. 459, 466, 546 S.E.2d 216, 220 (2001). "Just as the proffer principle applies to a trial court's order sustaining an objection to questions asked of a witness, it likewise applies to the trial court's exclusion of a witness." Ray v. Commonwealth, 55 Va. App. 647, 650 n.1, 688 S.E.2d 879, 881 n.1 (2010) (citations omitted).

Here, appellant called Dr. John Lloyd as a witness and asked the trial court to qualify him as an expert in "biomechanical causation and brain injury." After *voir dire*, the Commonwealth objected to his qualification as an expert in any subject, based upon his perjury charge in Florida. After some discussion, the trial judge asked appellant's counsel, "what do you expect Doctor Lloyd to testify to if I qualify him?" Counsel for appellant responded that he planned on having Dr. Lloyd address "what Doctor Lamb had indicated about the biomechanics." The trial judge stated that he would not allow Dr. Lloyd to testify at to the causation of R.S.'s injury, as Dr. Lloyd was not a medical doctor. Counsel for appellant then stated that "I could ask him as well about the specific forces that would be necessary . . . to cause the injuries," to which the trial court responded that he would again not allow Dr. Lloyd to discuss causation. After a recess, counsel for appellant asked for Dr. Lloyd to be qualified to "discuss just the field of biomechanics." The trial judge stated that this line of questioning was not relevant to the case.

- 13 -

The trial judge then ruled that "for all of [these] reasons I'm granting the Commonwealth's motion and not qualifying Doctor Lloyd."

At no point during his discussion with the court did counsel for appellant ever proffer any of the expected answers to the questions he stated he was going to ask Dr. Lloyd. He merely stated that he would ask Dr. Lloyd about Dr. Lamb's testimony regarding biomechanics and the forces necessary to cause R.S.'s injuries. Counsel for appellant never proffered what Dr. Lloyd's answers to these few questions would be. Appellant's inadequate proffer leaves this Court with no avenue to decide whether the trial court erred in sustaining the Commonwealth's objection to Dr. Lloyd's qualification as an expert witness. Here, appellant's failure to properly proffer the evidence excluded by the trial court's ruling precludes our consideration of the issue on appeal.

### III.  CONCLUSION

We conclude that the evidence was sufficient to support appellant's conviction for aggravated malicious wounding. Further, we hold that appellant failed to make an adequate proffer of his expert witness' expected testimony, and we therefore cannot assess whether the trial court committed error. For these reasons, we affirm the judgment of the trial court.

Affirmed.