COURT OF APPEALS OF VIRGINIA

Present:   Judges Kelsey, Alston and Senior Judge Annunziata
Argued at Richmond, Virginia


CECELIA LEIGH BURNETTE

                                                            OPINION BY
v.        Record No. 1158-11-3                    JUDGE ROSSIE D. ALSTON, JR.
                                                            JULY 31, 2012
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF BEDFORD COUNTY
James W. Updike Jr., Judge

David A. Oblon (Hilary D. Griffith; Albo & Oblon L.L.P., on
briefs), for appellant.

Rosemary V. Bourne, Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


        Cecelia Leigh Burnette (appellant) was convicted in a jury trial of child abuse in violation

of Code § 18.2-371.1.  On appeal she contends:  1) the evidence was insufficient to sustain her

conviction where the Commonwealth failed to prove that appellant committed the offense, knew

that another committed the offense, or failed to provide the necessary care; 2) the trial court erred

in admitting evidence of prior bad acts; 3) the trial court erred in precluding appellant from

asking an expert witness on cross-examination whether he agreed or disagreed with specific

scientific literature on the profile of abusive head trauma perpetrators; and 4) the trial court erred

in admitting autopsy photos because the cause of death was not in dispute.  We disagree and

affirm the judgment of the trial court.

I.  BACKGROUND

        On appeal, we view "the evidence in the light most favorable to the Commonwealth, the

party prevailing in the circuit court, and we accord the Commonwealth the benefit of all

reasonable inferences deducible from the evidence." Britt v. Commonwealth, 276 Va. 569, 573, 667 S.E.2d 763, 765 (2008) (citing Jay v. Commonwealth, 275 Va. 510, 524, 659 S.E.2d 311, 319 (2008); Bolden v. Commonwealth, 275 Va. 144, 148, 654 S.E.2d 584, 586 (2008)).

## A. Events of September 2, 2008

So viewed, the evidence indicated that on the morning of September 2, 2008, appellant took her eight-month-old daughter, M.B., to Dr. Anastasia Ketany's office, where Dr. Ketany examined M.B. and diagnosed her with an upper respiratory infection and ear infection. Dr. Ketany later testified at trial that the child appeared alert and appropriate during the examination and was observed drinking from a cup. Dr. Ketany also testified that appellant seemed rushed and angry at M.B.'s father, Adam Davis, during the examination.

Following the doctor's appointment, appellant returned to the home she shared with Joshua Cheek, her boyfriend, and left M.B. with Cheek while she went to the pharmacy to get a prescription filled for M.B.'s ear infection. While appellant was out, Cheek gave M.B. a bath, during which time he noticed she "did not look there at all," like she was "in a daze." While M.B. was seated in her bath chair, Cheek saw her head fall forward and then back.

Cheek removed M.B. from the tub, dressed her, and placed her in her swing. While M.B. was in the swing, Cheek noticed she appeared to have a seizure. Cheek stated that M.B. shook for three to five seconds and her eyes rolled toward the back of her head. Cheek removed M.B. from her swing, made multiple calls to appellant's cell phone, and, upon reaching appellant, described what happened. Appellant told Cheek "not to worry about it" and that she would be home in a minute. Appellant returned home forty-five minutes later.

After giving M.B. her medication and attempting to feed her, appellant placed M.B. back in her swing, where she remained most of the afternoon and appeared to be asleep. Around 3:30 p.m., appellant called the Child Protective Services employee previously assigned to a case

involving M.B., asking if she planned to do a home visit that day. Appellant stated during the phone call that she did not want the employee to visit because M.B. was sick. Around 5:30 p.m., appellant left with Cheek's grandmother to pick up her car while Cheek played video games with M.B. next to him in her swing. While appellant was gone, Cheek saw M.B. shake again, and her eyes rolled back in her head, and she went "lifeless." After being unable to reach appellant, Cheek called his mother and then 911.

Paramedics arrived and rushed M.B. to the nearest hospital, where physicians examined M.B. before transferring her to a hospital specializing in pediatric care. At the second hospital, physicians discovered that M.B. had sustained severe head trauma. Dr. Donald Kees examined M.B. and determined that she was brain dead. Doctors placed M.B. on life support, where she remained until September 4, 2008, when life support was removed and she died.

### B. The Police Investigation and Grand Jury

Doctors who treated M.B. alerted police, who came to the hospital and interviewed appellant and Davis. During this time, appellant consistently informed doctors and police officers that she was not aware of any head trauma suffered by M.B. During these various conversations, appellant did not mention to any medical professionals that M.B. had previously experienced seizures or exhibited seizure-like activity.

Kevin Young, an investigative officer, interviewed appellant the day after her daughter was hospitalized. After being told that someone had shaken M.B. to death, appellant told Young that the only thing she could think of was that something had happened when she left M.B. with Cheek so she could get M.B.'s prescriptions. Appellant speculated that maybe when M.B. "went over into the bathtub," Cheek had "grabbed her, freaked out and started shaking her." Appellant also mentioned for the first time that Cheek stated over the phone when he called appellant that he was scared and that M.B. did not "look right." Young then asked appellant when did M.B.

- 3 -

first have a seizure, and appellant stated that it was when Cheek was bathing M.B. the day she died.

Tim Stanley, an investigative officer, also interviewed appellant the day after her daughter was hospitalized and on several other occasions. Appellant initially informed Stanley that M.B. lost consciousness at appellant's grandmother's house, but almost immediately backtracked and said that it happened at her home, because Stanley "knew it happened [at her home]." Appellant told Stanley that her grandmother watched M.B. while appellant went to get the child's prescription on September 2, 2008. Appellant also told Stanley that later in the afternoon a "friend" came over who was going to take her to get her vehicle, and she left M.B. with the "friend's son," Cheek. Appellant told Stanley that when she returned, Cheek was standing in the driveway screaming that M.B. was not breathing and "they called 911."

Stanley informed appellant that her story did not match what she told the first investigating officer and that he knew she was lying. Appellant apologized for lying and said she lied because she was in a messy custody battle with Davis. Appellant then admitted that Cheek was watching M.B. when appellant was getting the prescription. Appellant also informed Stanley that Cheek called her four or five times while she was getting the prescription, telling her to hurry up and get home. When appellant returned home, she gave M.B. a dose of the new medicine, attempted to feed her, and placed her in her swing.

Stanley interviewed appellant a second time shortly thereafter on September 9, 2008. During the second interview, appellant first mentioned that M.B. had bumped her head on a table the day she died.

In January 2009, appellant testified before a grand jury about the events leading up to M.B.'s death. During her testimony, appellant stated that Cheek told her that M.B. had a seizure-like episode on September 1, 2008, the day before M.B. was rushed to the hospital, while

- 4 -

appellant was at work. Appellant stated she did not seek medical attention at that time because she thought Cheek was overreacting. Stanley, who was present during appellant's grand jury testimony, later testified at trial that appellant's grand jury testimony was the first time he heard anything about the child having a seizure on the day before she died.

Appellant also claimed during her grand jury testimony that she told Dr. Ketany or her nurse during M.B.'s September 2, 2008 appointment that M.B. "was having . . . these episodes of going unconscious." Dr. Ketany later testified at trial, asserting that appellant never mentioned M.B. having any seizures or exhibiting seizure-like behavior. According to Dr. Ketany, appellant also did not mention that M.B. hit or bumped her head before coming to the office. Dr. Ketany's nurse also testified that appellant never mentioned head traumas or seizures when she was examining M.B. prior to Dr. Ketany entering the room.

Police arrested appellant on October 2, 2009, on indictments for murder in violation of Code § 18.2-32 and felony child abuse in violation of Code § 18.2-371.1(A).

After appellant was arrested, Stanley interviewed appellant again. Appellant admitted to lying during her grand jury testimony. Appellant also informed Stanley for the first time that M.B. bumped her head on the sink and again "hard" on the changing station in Dr. Ketany's office bathroom on the morning of September 2, 2008.

### C. Jury Trial

Appellant was tried by a jury beginning on March 15, 2011. Among other witnesses, the Commonwealth presented the testimony of Cheek, Stanley, and Young, describing the events of September 2, 2008, and the investigation into the child's death, as described above. Cheek specifically denied ever shaking or hurting the child.

## 1. Medical Evidence

Dr. Kees, an expert in pediatrics, testified at appellant's trial. He opined that M.B.'s injuries were caused by rapid acceleration and deceleration of the head. Dr. Kees testified he performed a CT scan on M.B., which revealed blood around M.B.'s brain and retinal hemorrhages that were too numerous to count, indicating a lethal amount of force, consistent with shaking, was applied to the child. Dr. Kees testified that M.B.'s injuries would have produced immediate symptoms, such as a decreased level of responsiveness or change in mental status that would progressively worsen over time. He also noted other common symptoms included vomiting, sleepiness, irritability, abnormal crying, decreased feeding or no feeding at all, and lethargy.

Dr. Robin Foster testified as an expert in pediatrics. He agreed with Dr. Kees' conclusion that M.B. died from "abusive head trauma." He explained that abusive head trauma can only result from violent shaking or throwing or the child being thrown from a car in an accident. He emphasized that the lack of bruising and other evidence of external injuries indicated that M.B.'s injury was not caused by bumping her head. Dr. Foster opined that on his review of the medical records and history, M.B.'s fatal injuries occurred on the same day she presented to the hospital.

During cross-examination of both expert witnesses, appellant attempted to ask whether each witness agreed or disagreed with scientific literature showing that the profile of a shaken baby perpetrator is predominantly male, the first person to call 911, and the last person who is with the victim. The Commonwealth objected to the proposed line of questioning. The trial court sustained the Commonwealth's objection, stating that the testimony was outside the scope of the witness' domain and would invade the province of the jury to determine the ultimate issue of guilt or innocence of the appellant.

Dr. Paul Benson, the medical examiner who performed M.B.'s autopsy, also provided testimony concerning the cause of M.B.'s death. Benson opined that the injuries he observed while performing the autopsy were inconsistent with accidental injuries. In describing the severity of M.B.'s injuries, Benson referenced two photographs taken during the autopsy, one showing M.B.'s face and another showing the inside of the skull.

The trial court admitted the autopsy photographs into evidence over appellant's objection. Appellant objected to the introduction of the photographs, arguing they were more prejudicial than probative and that the cause of death was not in dispute. The Commonwealth responded that it was required to prove each element of the charged offense and could not "stipulate away" any element; therefore, the photographs were necessary to prove both that M.B. was the subject of the autopsy and that M.B. died from the internal injuries depicted in the photograph of her brain. The trial court overruled the objection, stating that the law allowed the Commonwealth to introduce autopsy photographs even when the cause of death had been stipulated.

2. Evidence of Prior Bad Acts

At the beginning of trial, appellant made a motion *in limine* asking that any evidence of prior bad acts by appellant be excluded, referring specifically to a prior Child Protective Services complaint because of bruises on M.B. The trial court denied the motion.

At trial, the Commonwealth introduced testimony from Davis, Brenda Lacey, the child's daycare provider, and Tomi Turner, an employee for Child Protective Services, regarding previous injuries to M.B..

Davis testified that he and appellant alternated custody of M.B., but both he and appellant used the same babysitter, Lacey. Davis testified that Lacey called him approximately one month before M.B. died, asking him to come to her house to look at bruises on M.B.'s face and arm after appellant had dropped M.B. off one morning. Davis called social services in response to

the bruises and discussed the matter with appellant. Appellant informed Davis that the bruises on M.B.'s arm were from a food allergy and the bruises on her face were from fingernail clippers.

Lacey also testified at trial, stating that on August 6, 2008, when appellant dropped off M.B. at daycare, she noticed bruises on M.B.'s arm and cheek. When Lacey inquired about these marks, appellant told her they were the result of a food allergy. Appellant never mentioned that M.B. had injured her face with a pair of fingernail clippers. Turner also testified, indicating that appellant told her that the mark on M.B.'s arm came from a Popsicle causing a hive and that the bruise to M.B.'s face occurred when the child hurt herself with a pair of fingernail clippers.

Cheek also provided testimony concerning appellant's past treatment of M.B. He testified that on a prior occasion when he returned to the house he shared with appellant, appellant threw M.B. at him from a few yards away as he walked through the door. After throwing M.B., appellant said, "I can't get her to stop crying, can you get her to stop crying?" Cheek also testified that he recalled the bruise on M.B.'s face.

### 3. Motion to Strike

At the conclusion of the Commonwealth's case-in-chief, appellant moved to strike the evidence as insufficient, arguing that there was no direct evidence proving that appellant was the one who inflicted M.B.'s fatal injuries or that she knew Cheek inflicted the injuries and did nothing to prevent the abuse. After the Commonwealth's argument in response, the trial court denied the motion to strike.

At the conclusion of all of the evidence, appellant renewed her motion to strike. The trial court denied the motion.

### 4. Verdict and Sentencing

The jury acquitted appellant of murder but convicted her of felony child abuse and recommended a sentence of eight years along with a $75,000 fine. The trial court sentenced appellant in accordance with the jury's recommendation. Following sentencing, appellant moved to set aside the verdict, arguing that the evidence was insufficient to support her conviction of felony child abuse because there was insufficient evidence to prove beyond a reasonable doubt that appellant was the individual who committed the offense, knew that another committed the offense before the fact, or failed to provide necessary care. The trial court denied the motion. This appeal followed.

## II. ANALYSIS

### A. Sufficiency of the Evidence

Code § 18.2-371.1(A) states that a parent who "by willful act or omission or refusal to provide any necessary care for the child's health causes or permits serious injury to the life or health of [her] child shall be guilty of a Class 4 felony." On appeal, appellant argues that the evidence was insufficient to support her conviction for felony child abuse because the Commonwealth failed to prove that appellant committed the offense, knew that another committed the offense, or failed to provide necessary care.[1] We reject appellant's argument and find based upon the applicable standard of review that the evidence was sufficient to support appellant's conviction for felony child abuse.

---

[1] Appellant concedes on brief that "[t]he evidence shows that [M.B.] was intentionally killed and that the mortal injuries would certainly constitute child abuse," Appellant's Br. at 9, and questions only whether sufficient evidence was presented to find appellant caused M.B.'s injuries. Accordingly, we find the "willful act resulting in serious injury" element of the statute satisfied and focus our review on whether the evidence was sufficient to find that appellant, as opposed to someone else, committed the offense.

When reviewing a challenge to the sufficiency of the evidence to support a conviction, this Court views the evidence in the light most favorable to the Commonwealth as the prevailing party below, granting to it all reasonable inferences drawn from that evidence. See Archer v. Commonwealth, 26 Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (quoting Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987)). This Court will not disturb a trial court's judgment "unless it is 'plainly wrong or without evidence to support it.'" Barlow v. Commonwealth, 26 Va. App. 421, 429, 494 S.E.2d 901, 904 (1998) (quoting Beavers v. Commonwealth, 245 Va. 268, 282, 427 S.E.2d 411, 421 (1993)).

Appellant argues that the evidence was insufficient to exclude a reasonable hypothesis of innocence that someone other than appellant was the criminal agent. Specifically, appellant argues that the evidence was insufficient to prove that appellant, rather than Cheek, inflicted the injuries upon M.B. Appellant contends that in a case relying on circumstantial evidence, "'[a]ll necessary circumstances proved must be consistent with guilt and inconsistent with innocence,'" which is accomplished only when the chain of circumstances is unbroken. Christian v. Commonwealth, 221 Va. 1078, 1082, 277 S.E.2d 205, 208 (1981) (quoting Webb v. Commonwealth, 204 Va. 24, 34, 129 S.E.2d 22, 29 (1963)). Citing Christian, appellant asserts that the chain of circumstances is broken where there is another person present who had the opportunity to commit the crime.

Appellant's reliance on Christian is misplaced. In Christian, the defendant was convicted of felony child neglect after a daycare worker discovered injuries to the defendant's daughter. Id. However, unlike the present case, at least five people had an opportunity to handle the child during the period in which her injuries occurred, and the Commonwealth failed to present evidence that these individuals did not cause the injuries. Id. The Supreme Court overturned the defendant's conviction for felony child neglect because the evidence raised only the suspicion

that the defendant injured her child during the night, since numerous individuals had contact with the child the next morning without discovering the child's painful fractures. Id.

In the present case, the evidence at trial indicated that M.B. died from rapid acceleration and deceleration of her head, which was consistent with violent shaking or throwing and inconsistent with accidental head bumps. The evidence also established that M.B.'s injuries occurred on the same day that she was rushed to the hospital, September 2, 2008. After initially lying about who was watching M.B. on September 2, 2008, appellant later admitted that she and Cheek were the only individuals caring for the child that day until Lynette Cheek, Joshua Cheek's mother, administered CPR just before emergency personnel arrived. Accordingly, appellant contends that the evidence shows merely that either appellant or Cheek (or both) fatally injured the child. Appellant also argues that the evidence suggests that Cheek inflicted the injuries upon M.B. because Cheek was alone with the child when both seizures occurred.

Appellant is correct that, as in Christian, the evidence showed that both appellant and Cheek had the opportunity to inflict the injuries upon M.B., though both denied causing the injuries. However, unlike in Christian, the Commonwealth in the instant case presented evidence that Cheek did not cause the injuries through Cheek's specific testimony that he had never shaken or hurt M.B. "The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995) (citing Schneider v. Commonwealth, 230 Va. 379, 382, 337 S.E.2d 735, 736-37 (1985); Carter v. Commonwealth, 223 Va. 528, 532, 290 S.E.2d 865, 867 (1982)). Because credibility determinations are solely the province of the fact finder, Long v. Commonwealth, 8 Va. App. 194, 199, 379 S.E.2d 473, 476 (1989), the jury was entitled to accept Cheek's denial and, having done so, could reasonably infer that appellant fatally injured M.B. See Collado v.

- 11 -

Commonwealth, 33 Va. App. 356, 365, 533 S.E.2d 625, 630 (2000) (finding evidence supporting conviction sufficient where child was "criminally assaulted during the period appellant had sole custody and control of the child").

The jury was particularly entitled to accept Cheek's testimony and reject appellant's explanations for M.B.'s injuries here, as the Commonwealth introduced numerous examples where appellant lied to the police and doctors,[2] including appellant's admission that she perjured herself in front of the grand jury. See Covil v. Commonwealth, 268 Va. 692, 696, 604 S.E.2d 79, 82 (2004) (finding "[a] false or evasive account is a circumstance . . . the fact-finder may properly consider as evidence of guilty knowledge"). Moreover, the jury was also free to credit or discredit appellant's explanation for asking Child Protective Services not to come to the house on the day M.B. was injured. And, in discrediting appellant's explanation, the jury was free to perceive the call as an attempt by appellant to conceal her guilt. Id. (citing Emmett v.

---

[2] Appellant contends the Commonwealth improperly relied on appellant's false explanations of the circumstances surrounding the child's death. Appellant asserts that the Commonwealth failed to prove "by the facts or the circumstances, or both, that beyond all reasonable doubt that the defendant committed the crime charged against [her]." Hyde v. Commonwealth, 217 Va. 950, 955, 234 S.E.2d 74, 78 (1977).

Appellant's reliance on Hyde is misplaced. In Hyde, a rape victim in a mental hospital claimed that a tall, white man who had offered her a cigarette had taken her into the woods and raped her. Id. at 951, 234 S.E.2d at 76. The victim later died from a ruptured intestine she sustained during the ordeal. Id. The evidence in Hyde demonstrated that two other men, in addition to Hyde, were present with the victim shortly before the rape occurred. Id. at 951, 234 S.E.2d at 76. One of the two men later confessed to having sex with the victim and repeatedly hitting her in the stomach on the day she died. Id. at 953, 234 S.E.2d at 77. On this basis, the Court held appellant's false statements, alone, were insufficient to support his conviction. Id. at 954, 234 S.E.2d at 77 (stating that "to assume that [the defendant] was the only tall, white man who had given [the victim] a cigarette that day would be to assume too much").

The present case is distinguishable. Here, the evidence at trial demonstrated that M.B.'s injuries occurred on the day she was rushed to the hospital. On that day, appellant and Cheek had exclusive custody of the child. Witnesses also testified that appellant seemed rushed and angry the morning M.B. was injured. Cheek testified during trial that he never injured M.B. Finding Cheek's testimony credible, the jury was free to reasonably infer that appellant caused M.B.'s injuries. In this light, appellant's false explanations provided the jury an additional reason to find appellant's explanations for M.B.'s injuries less credible.

- 12 -

Commonwealth, 264 Va. 364, 372, 569 S.E.2d 39, 45 (2002) ("[H]aving rejected a defendant's attempted explanation as untrue, [a fact finder] may draw the reasonable inference that his explanation was made falsely in an effort to conceal his guilt.").

Appellant's argument that the evidence suggests that Cheek inflicted the injuries upon M.B because Cheek was alone with the child when both seizures occurred is also unavailing. To the contrary, this circumstance further distinguishes the present case from Christian. Unlike Christian, where numerous individuals were in contact with the child before her painful fractures were noticed, Cheek testified that both episodes occurred shortly after appellant left M.B. with him and after appellant had custody of M.B. Accordingly, unlike Christian, this is not a case of mere opportunity used to prove guilt. Rather, we are presented with opportunity "reinforced by other incriminating circumstances" to establish guilt beyond a reasonable doubt. Christian, 221 Va. at 1082, 277 S.E.2d at 208 (finding opportunity reinforced by other incriminating evidence may be sufficient to prove guilt beyond a reasonable doubt).

We cannot say this evidence was so deficient that only an unreasonable trier of fact could have concluded that appellant caused M.B.'s injuries. Accordingly, we determine the evidence is sufficient to support appellant's conviction.

### B. Evidence of Prior Bad Acts

Appellant next assigns error to the admission of evidence of prior bad acts at trial. The prior bad acts evidence consists of earlier Child Protective Services involvement in M.B.'s care, prior suspicious injuries to M.B., such as bruises and marks on her body, and an incident where appellant tossed M.B to Cheek.[3] Appellant contends that these events are improper character

---

[3] Appellant conceded during oral argument that evidence that appellant once threw M.B. to Cheek because M.B. would not stop crying was appropriately admitted under an exception to the rule generally prohibiting the admission of prior bad acts. Because appellant has conceded the admissibility of this evidence, we do not consider whether the trial court erred in admitting it.

evidence, and, even if they were proper, they were so remote and inflammatory that their probative value was substantially outweighed by the danger of unfair prejudice. For the reasons identified below, we reject appellant's argument that the trial court erred in admitting evidence of prior bad acts.

"As a general rule, evidence of other offenses is inadmissible to prove guilt of the crime for which the accused is on trial. Exceptions to this general rule, however, are as well established as the rule itself." Moore v. Commonwealth, 222 Va. 72, 76, 278 S.E.2d 822, 824 (1981) (internal citations omitted). "Evidence of other offenses is admitted if it shows the conduct and feeling of the accused toward his victim, if it establishes their prior relations, or if it tends to prove any relevant element of the offense charged." Kirkpatrick v. Commonwealth, 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970).

> Admission of evidence under these exceptions, however, is subject to the further requirement that the legitimate probative value of the evidence must exceed the incidental prejudice caused the defendant. Lewis v. Commonwealth, 225 Va. 497, 502, 303 S.E.2d 890, 893 (1983). Further, the admission of such "other crimes" evidence is prohibited when its only purpose is to show that the defendant has a propensity to commit crimes or a particular type of crime and, therefore, probably committed the offense for which he is being tried. Kirkpatrick, 211 Va. at 272, 176 S.E.2d at 805.

Guill v. Commonwealth, 255 Va. 134, 139, 495 S.E.2d 489, 491-92 (1998).

Determinations about the admission of evidence are left to the sound discretion of the trial court and will not be reversed on appeal unless the trial court abused that discretion. Bell v. Commonwealth, 49 Va. App. 570, 576, 643 S.E.2d 497, 500 (2007) (citing Blain v. Commonwealth, 7 Va. App. 10, 16, 371 S.E.2d 838, 842 (1988)).

The evidence shows M.B. suffered injuries to her face and arm while in appellant's and Cheek's custody. Both appellant and Cheek denied injuring M.B., though in doing so appellant

provided inconsistent explanations for the child's injuries. The injuries were first discovered by

Lacey, M.B.'s babysitter, who immediately informed the child's father, Davis. Davis questioned

appellant, who told him that the bruises were from a food allergy (arm) and fingernail clippers

(face). Lacey also questioned appellant, who stated that the injuries were the result of a food

allergy. Appellant never mentioned to Lacey that M.B. injured her face with fingernail clippers.

In response to the injuries, Davis called social services. Child Protective Services interviewed

appellant, and appellant stated that the mark on M.B.'s arm came from a popsicle causing a hive

and the bruise on M.B.'s face occurred when the child hurt herself with a pair of fingernail

clippers.

The evidence of the bruising and scratches and the resulting involvement of Child

Protective Services in M.B.'s care, considered together with appellant's inconsistent

explanations as to how the injuries occurred, possessed significant probative value as it

demonstrated appellant's prior relationship with and feelings toward M.B. See Evans v.

Commonwealth, 215 Va. 609, 614, 212 S.E.2d 268, 272 (1975) (finding evidence of prior

violence admissible when "motive, intent or knowledge of the accused is involved"); Ortiz v.

Commonwealth, 276 Va. 705, 715, 667 S.E.2d 751, 758 (2008) (finding evidence of prior bad

acts admissible to show the conduct or attitude of the defendant toward the child). Therefore,

evidence of these prior injuries to M.B. was admissible. Id.

Appellant contends, however, that the trial court erred in admitting the evidence because

there was no proof that appellant caused those injuries. We reject this argument.

> Long-accepted principles of Virginia law support the proposition
> that, when a credibility determination must be made with respect to
> the predicate for the admission of proffered conditionally relevant
> evidence, that credibility determination must be made by the jury.
> . . . In the context of evaluating the predicate of conditionally
> relevant evidence, the trial court's review of the credibility of a
> witness is limited to determining whether his or her testimony is

"unreasonable, as a matter of law, or inherently incredible," or
such that reasonable people "could not differ as to its effect."

Pavlick v. Commonwealth, 27 Va. App. 219, 228-29, 497 S.E.2d 920, 925 (1998) (internal

citations omitted).

In the present case, the relevance of the prior injuries was dependent upon a

determination of witness credibility. Whether the jury believed appellant's explanation that

M.B. injured herself was a determination solely in their discretion. Myers v. Commonwealth, 11

Va. App. 634, 635, 400 S.E.2d 803, 804 (1991) (citing Barker v. Commonwealth, 230 Va. 370,

373, 337 S.E.2d 729, 732 (1985)). Similarly, the jury was free to find Cheek's testimony that he

never hurt M.B. credible and, having done so, could reasonably infer that appellant caused

M.B.'s prior injuries. The record established that the child was in the custody of appellant and

Cheek when the prior injuries occurred, though both denied ever injuring the child. The jury was

entitled to consider and resolve this conflict in the evidence against appellant.

For the foregoing reasons, we find the trial court did not err in admitting the evidence of

prior injuries or Child Protective Services involvement.[4]

### C. Evidence on Profile of Abusive Head Trauma Perpetrators

Under her third assignment of error, appellant asserts the trial court erred in precluding

appellant from asking an expert witness on cross-examination whether he agreed or disagreed

---

[4] Even if the trial court erred in admitting the evidence of prior bad acts, such error was harmless. An error is harmless "[i]f, when all is said and done, the conviction is sure that the error did not influence the jury, or had but slight effect . . . ." Clay v. Commonwealth, 262 Va. 253, 260, 546 S.E.2d 728, 731-32 (2001) (citing Kotteakos v. United States, 328 U.S. 750, 764-65 (1946)). Here, the evidence of prior bad acts would have had but a slight effect on the jury. The evidence clearly established that M.B. was injured while in the custody of appellant and Cheek. The evidence also demonstrated that appellant lied to investigators and to doctors about the events on the day M.B. was injured. And, irrespective of the actions that led to Child Protective Services involvement, appellant contacted Turner on the day M.B. was injured and encouraged her not to visit the house. In light of these facts, evidence of prior injuries had slight effect on the conviction.

with specific scientific literature on the profile of abusive head trauma perpetrators.  Appellant contends this was a critical line of questioning that the trial court should have permitted, because appellant's defense was that Cheek had hurt M.B., and the scientific literature supported this theory.  Specifically, appellant wanted to question Dr. Kees and Dr. Foster about the "overwhelming" scientific consensus that the profile of a shaken baby perpetrator is (1) a white male, (2) the person who first calls the emergency number 911, and (3) the person who is last with the victim.

In a criminal case, an expert may give an opinion based on his "'own knowledge of facts disclosed in his testimony or . . . upon facts in evidence assumed in a hypothetical question.'" Simpson v. Commonwealth, 227 Va. 557, 565, 318 S.E.2d 386, 391 (1984) (quoting Walrod v. Matthews, 210 Va. 382, 388, 171 S.E.2d 180, 185 (1969)).

> "Whether a witness is qualified to render an expert opinion is a question submitted to the sound discretion of the trial court." Nevertheless, "the record must show that the proffered expert witness has sufficient knowledge, skill, or experience to render him competent to testify as an expert on the subject matter of the inquiry."

Mohajer v. Commonwealth, 40 Va. App. 312, 320, 579 S.E.2d 359, 363 (2003) (quoting Combs v. Norfolk and Western Ry. Co., 256 Va. 490, 496, 507 S.E.2d 355, 358 (1998)).

We find that the trial court did not err in precluding appellant's line of questioning on cross-examination on this basis, as neither Dr. Foster nor Dr. Kees was qualified as an expert in the sociology of shaken baby/abusive head trauma perpetrators.[5]  Here, both expert witnesses qualified as experts in pediatrics, and nothing more.

---

[5] In finding the trial court did not abuse its discretion by precluding appellant's evidence, we note that numerous jurisdictions have held that profile evidence is categorically inadmissible, though the underlying rationales differ widely.  Some courts have excluded profile evidence on relevancy grounds.  See Commonwealth v. Day, 569 N.E.2d 397, 399 (Mass. 1991) (finding profile evidence "does not meet the relevancy test, because the mere fact that a defendant fits the

Moreover, appellant misconstrues the record when she states that the Commonwealth proffered Dr. Kees as an expert in "fatality review of child deaths and child abuse." While Dr. Kees testified that he has spoken locally and regionally on different topics of child abuse, the Commonwealth requested the trial court certify Dr. Kees only as an expert in pediatrics.

Although the determination is left to the trial court's discretion, an expert may not testify on a subject matter until the proponent of the testimony has demonstrated that the expert has "'sufficient knowledge, skill, or experience to render him competent to testify as an expert on the subject matter of the inquiry.'" Mohajer, 40 Va. App. at 320, 579 S.E.2d at 363 (quoting Combs, 256 Va. at 496, 507 S.E.2d at 358). Without more than Dr. Kees' brief statement that he speaks in public about child abuse, the trial court had no basis upon which to conclude that Dr. Kees had expertise in the typical profile and activities of abusive head trauma perpetrators. Accordingly, we affirm the trial court's decision.

### D. Admission of Autopsy Photographs

Finally, under her fourth assignment of error, appellant argues that the trial court erred in admitting graphic autopsy photos where the cause of death was not in dispute. We reject appellant's argument and hold that the trial court did not err in admitting the two autopsy photographs into evidence.

---

profile does not tend to prove that a particular defendant physically abused the victim" (citing State v. Brown, 370 So.2d 547, 554 (La. 1979)); Duley v. State, 467 A.2d 776, 780 (Md. Ct. Spec. App. 1983) (finding child battering profile "totally irrelevant because it does not tend to prove that [the defendant] committed the acts of abuse attributed to him"); State v. Maule, 667 P.2d 96, 99 (Wash. Ct. App. 1983) (noting "relevancy of [such] evidence is not discernable"). Other courts have considered profile evidence impermissible character evidence. See Gruwell v. State, 254 P.3d 223 (Wyo. 2011) (finding profile evidence constitutes inadmissible character evidence). Still others have noted that such evidence invades the province of the jury, see State v. Jaco, 156 S.W.3d 775, 780 (Mo. 2005) (finding the proposed profile evidence invaded the jury province by expressing an opinion on the guilt or innocence of the defendant), and that such evidence is highly prejudicial, see Brunson v. State, 79 S.W.3d 304 (Ark. 2002).

In addressing appellant's assignment of error, we note that appellate courts will not reverse a trial court's decision to admit evidence, including autopsy photographs, unless the trial court abused its discretion in that decision. See Teleguz v. Commonwealth, 273 Va. 458, 482, 643 S.E.2d 708, 723 (2007). Moreover,

> [a]ccurate photographs of a crime scene are not rendered inadmissible solely because they are gruesome, and autopsy photographs of the victim are admissible to show the atrociousness or vileness of a crime. Juniper [v. Commonwealth], 271 Va. [362,] 413, 626 S.E.2d [383,] 415-16 [(2006)], Walton v. Commonwealth, 256 Va. 85, 92, 501 S.E.2d 134, 138, cert. denied, 525 U.S. 1046, 142 L. Ed. 2d 544, 119 S. Ct. 602 (1998). Such photographs must nevertheless be excluded if their prejudicial effect substantially outweighs their probative value. Walker v. Commonwealth, 258 Va. 54, 69, 515 S.E.2d 565, 574 (1999), cert. denied, 528 U.S. 1125, 145 L. Ed. 2d 829, 120 S. Ct. 955 (2000). Such weighing is left to the discretion of the trial court and will not be disturbed on appeal, absent an abuse of discretion. Id.

Id.

We conclude that in the circumstances of this case, the trial court did not abuse its discretion by admitting the autopsy photographs of the victim. A defendant's stipulation with regards to the cause of the victim's death does not allow the appellant to sanitize the evidence and thus preclude the Commonwealth from introducing photographs showing the dead victim, even if the pictures may be considered gruesome. See Orbe v. Commonwealth, 258 Va. 390, 402, 519 S.E.2d 808, 815 (1999) (citing Chichester v. Commonwealth, 248 Va. 311, 326, 448 S.E.2d 638, 648 (1994)) (allowing photographs because they were probative of motive, intent, malice, premeditation and the atrociousness of the crime).

Here, the admitted photographs possessed probative value beyond simply identifying the cause of the victim's death. At trial, the Commonwealth introduced the photographs through the medical examiner, who used the photos to demonstrate the hemorrhages to the victim's brain, too numerous to count, which supported the Commonwealth's inferences of malice and intent; proof

of both requirements was necessary to support the charge of second-degree murder.  Moreover, the photos were probative to demonstrate M.B.'s injuries, which were mostly internal, to corroborate each expert's testimony about the cause of the M.B.'s death, and to indicate appellant's method in killing the child.

We find, therefore, the trial court did not err in admitting the two autopsy photographs into evidence.

### III.  CONCLUSION

For these reasons, we find that the evidence was sufficient to support appellant's conviction for felony child neglect and that the trial court did not err in admitting evidence of appellant's prior bad acts, precluding appellant from asking Dr. Kees about scientific literature on the profile of abusive head trauma perpetrators, and admitting autopsy photos of M.B. Therefore, appellant's conviction is affirmed.

<u>Affirmed.</u>