COURT OF APPEALS OF VIRGINIA

Present:   Judges O'Brien, AtLee and Senior Judge Frank
Argued at Norfolk, Virginia

UNPUBLISHED

LARRY EUGENE CONEY, JR.

MEMORANDUM OPINION* BY
v.        Record No. 0159-16-1                JUDGE ROBERT P. FRANK
                                              MARCH 7, 2017
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
Christopher W. Hutton, Judge

Charles E. Haden for appellant.

Aaron J. Campbell, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


Larry Eugene Coney, Jr. was convicted in a bench trial of second-degree murder and

aggravated malicious wounding of a three-year-old child.  He contends on appeal that the

evidence did not prove he committed the offenses.  For the reasons stated, we affirm the

judgment of the trial court.

BACKGROUND

"On appeal, we review the evidence in the light most favorable to the Commonwealth,

granting to it all reasonable inferences fairly deductible therefrom."  Wells v. Commonwealth, 65

Va. App. 722, 725, 781 S.E.2d 362, 364 (2016) (quoting Martin v. Commonwealth, 4 Va. App. 438,

443, 358 S.E.2d 415, 418 (1987)).

So viewed, the evidence established that on Saturday, May 17, 2014, K.B., the

three-year-old victim, spent the day with his aunt, Diana Jean.  While visiting the playground and

_____
* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

the beach, K.B. behaved as a normal, active child. He had no visible bruises, scars, or injuries to his legs, arms, or head. Jean described him as "perfectly fine." She returned K.B. to appellant's apartment at approximately 7:00 p.m. on May 17. Appellant was then the boyfriend of K.B.'s mother, Carrie Jones. Jones and K.B. had been staying for several nights at the apartment with appellant and his roommate, Essex Ryales.

When K.B. woke up the following morning, he appeared normal, pain free, and happy. Appellant agreed to watch the child while Jones went to work. Jones did not know whether Ryales was in the apartment on the morning of May 18, 2014, but his bedroom door was closed.

Jones left for work at around 6:45 a.m., caught a bus, and arrived for her shift at a fast-food restaurant before 9:00 a.m. At 2:16 p.m., Jones called appellant to see how he and K.B. were doing. Appellant said they were eating. Jones talked to K.B., who told her he was "eating to get big and strong." She did not detect any distress in K.B.'s voice. She described the conversation with appellant as normal and pleasant.

Jones left work at 5:00 p.m., but missed her first bus and had to wait for another bus. As she waited, she called appellant, who said that K.B. was asleep. The call became contentious because Jones was frustrated about not having a car and having to rely on bus transportation. When appellant said, "Bitch, you act like I'm not . . . out here doing what I need to do," Jones hung up and refused to answer two more calls from him.

Jones arrived at the apartment at around 7:10 p.m., and heard loud music playing. When appellant answered the door, they did not greet each other because they were both still upset. Jones then went straight to the bedroom where K.B. was sleeping. The door to Ryales' room was open and he was not there when Jones came home, but she had no idea when he had left the apartment.

Jones thought K.B. looked as if he had had a seizure. His hand was clenched, his head was to the side, and his eyes were closed. He was also drooling, his breathing was labored, and he was

in a puddle of his own urine. Jones testified K.B. began having febrile seizures when he was one year old and had about eight or nine seizures over his lifetime. During the seizures, K.B. would be still and would not thrash about. The seizures did not last more than five minutes.

Jones ran back into the living room and said to appellant, "You're in here while my son is seizing." She returned to K.B., laid him on his side, and checked his temperature. Because the febrile seizures were caused by fevers, she sent appellant out for Tylenol at approximately 7:25 p.m.

Jones unsuccessfully tried to wake K.B. She called 911 at approximately 7:28 p.m., and the paramedics arrived shortly thereafter. Appellant had not returned from the store before the paramedics arrived and transported K.B. to Sentara CarePlex Hospital.

As doctors attended to K.B. at the hospital, Jones called appellant and asked him to bring her phone charger. Appellant inquired as to K.B.'s condition, but Jones had no information to give him. Appellant brought the charger, which another person delivered to Jones. Not long after, K.B. was transported to Children's Hospital of the King's Daughters in Norfolk (CHKD).

At CHKD's waiting room, Jones called appellant and asked him what had happened to her son. Appellant said that K.B. could have had a seizure. He told Jones to say she was with K.B. all day and that K.B. was fine all day. Jones did, in fact, initially lie and tell Child Protective Services that she was with K.B. all day. Later, however, when the doctor explained K.B.'s terminal condition, she told them the truth that appellant had watched K.B. while she was at work.

On May 19, 2014, Dr. Susan Lamb, an expert in child abuse and neglect, examined K.B. in the pediatric Intensive Care Unit at CHKD. When she examined him, K.B. was intubated, unresponsive, essentially without brain function, unable to breathe without a ventilator, and covered in a myriad of bruises. Dr. Lamb described some of K.B.'s bruises as "patterned," meaning it was likely a linear object (such as a belt or part of a belt) or adult fingertips or knuckles had caused them. Some of the bruises were not patterned, but were located in an area (such as the ears) where

children typically did not injure themselves accidentally. K.B. had "too-numerous-to-count impact sites all over the front of his head and left side of his head," ruling out accidental injury. Dr. Lamb also noted bruises to K.B.'s upper thighs, abdomen, hip bone, left flank, forearm, and both ears.

Dr. Lamb further testified as to the results of a CT scan of K.B.'s brain, taken upon his admission to Sentara. There was swelling outside of K.B.'s skull, indicating an acute injury. The brain was so damaged and so swollen that it was pushing the blood from the brain up against the skull. "[T]he combination of skull fracture, subdural hemorrhage and brain injury indicates a significant trauma, rotational acceleration-deceleration forces in an area that damaged the whole brain." Dr. Lamb concluded K.B.'s injuries were caused by blunt force trauma.

Dr. Lamb testified that a significant brain injury like K.B.'s would have been noticeable immediately after it occurred. While Dr. Lamb could not date the bruises by their appearance alone, she testified "the head injury is dateable by when he became abnormal, when he became ill and had neurological symptoms." She stated that after someone received a significant brain injury, such as K.B.'s, he would be unconscious, vomiting, and not able to walk. The person could be having seizures. She said no observer would have thought K.B.'s condition was "normal."

On cross-examination, Dr. Lamb indicated the injury to K.B.'s brain could have occurred immediately prior to the arrival of the emergency personnel. However, she reiterated that K.B. would have been symptomatic instantly after the head trauma.

Dr. Lamb stated that children who continued to survive with the degree of brain injury that K.B. had would be unable to talk and walk and would be kept on ventilators and feeding tubes for the rest of their lives, which would be shortened due to their medical condition.

K.B. died on May 20, 2014. Forensic pathologist Dr. Elizabeth Kinnison performed the autopsy. Dr. Kinnison described numerous bruises and abrasions to K.B.'s head, thigh, and body.

Dr. Kinnison determined that "[t]he bruises all appeared fresh or relatively fresh." Dr. Kinnison further determined that the bruises and abrasions would have been caused by blunt force.

K.B. had one recent and two older skull fractures, which indicated blunt force. K.B. also had bruising on the undersurface of the scalp, a swollen brain, a subarachnoid hemorrhage (bleeding on the membrane of the brain), bleeding around the optic nerves, and a scant retinal hemorrhage (bleeding inside the eye). In addition to the head injuries, K.B. had internal torso injuries and a healing rib fracture.[1] The doctor found no disease that would have caused those injuries. She concluded that K.B. died from blunt force head injuries, but she could not pinpoint the time of injury.

K.B.'s maternal grandmother, Clotelia Yvonne Simmons, learned of K.B.'s injuries on May 18. When she telephoned appellant to ask what happened to K.B., he responded that he did not know.

Simmons called appellant again on May 19 and asked what happened to K.B. This time, appellant told her that he had left K.B. with his roommate while he went to the store. When Simmons asked appellant why he lied to her about not going anywhere on the day he watched K.B., appellant replied that he had not wanted her to think he was not a responsible caretaker.

At no time did appellant suggest that his roommate had harmed K.B. Appellant told Simmons that when he returned from the store, K.B. was on the couch falling asleep. Appellant said K.B. was fine "at that point" and he saw no signs of abuse. Appellant also told Simmons that

---

[1] Dr. Lamb related during her testimony that K.B. had been to a hospital emergency room in April 2014 for a seizure, which she said could have correlated with the rib fracture and perhaps the older skull fractures and been caused by an abusive injury. No additional evidence regarding this incident was presented at trial. Jones testified on cross-examination she had never noticed any prior injuries to K.B., such as rib or skull fractures, before May 18. She said she had not been involved in an investigation by Child Protective Services until K.B. was hospitalized on May 18, 2014.

when he returned from the store, he saw "some guys" in the hallway and they "must have walked into the house and did this to [K.B.]."

Later on May 19, at 6:15 p.m., appellant called Simmons. During the call, appellant kept saying that he was "going to go ahead and give hi[m]self up" to the police. He asked Simmons, whom he referred to as "Mommy," if he could still call her.

Appellant and Simmons talked again on May 20 at 12:25 a.m. when appellant called to ask about K.B. Simmons told him that K.B. had died, and appellant began to cry. Simmons asked him again what had happened to the child, but got no response. Appellant called her at 5:52 a.m. and told her, "I messed up and I – I'm sorry, and I really would like to see you and Carrie so I can explain what happened." The detective assigned to the case advised Simmons and Jones not to meet with appellant, and Simmons did not talk to appellant again.

Detective Baer obtained a warrant at 1:35 p.m. on May 20, 2014, charging appellant with K.B.'s murder.[2] At some time after that, appellant telephoned Baer and said he wanted to turn himself in to police. Baer arranged to meet appellant, but appellant did not appear. He was later arrested in New York City on charges there and extradited to Virginia.

In finding appellant guilty of both charges, the trial court made a number of factual findings, including that K.B.'s injuries occurred on May 18 after Jones went to work and before she returned. The court rejected Jones' initial statement to investigators that she had been with the child that entire day and found that other evidence supported her testimony that she was at work all day. The court rejected the hypothesis that appellant's roommate had harmed the child. The court also relied

---

[2] The warrant charging appellant with the aggravated malicious wounding of K.B. was issued at 6:36 p.m. on May 19, 2014.

on Simmons' testimony regarding the statements appellant had made to her in concluding appellant had the opportunity to injure K.B. and had done so.

This appeal followed.

<u>ANALYSIS</u>

On appeal, appellant argues at least two other people – Jones and Ryales – had access to K.B., thus creating a reasonable hypothesis of innocence.

"When considering a challenge to the sufficiency of evidence on appeal, we review the evidence in the light most favorable to the prevailing party at trial and consider all inferences fairly deducible from that evidence." <u>Dunne v. Commonwealth</u>, 66 Va. App. 24, 26, 782 S.E.2d 170, 171 (2016) (quoting <u>Jones v. Commonwealth</u>, 276 Va. 121, 124, 661 S.E.2d 412, 414 (2008)). In conducting such a review, this Court will not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." <u>Dunn v. Commonwealth</u>, 52 Va. App. 611, 618, 665 S.E.2d 868, 871 (2008) (*en banc*) (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 318-19 (1979)). "Rather, 'the relevant question is whether . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" <u>Id.</u> Thus, this Court will uphold the conviction of the trial court "unless it is plainly wrong or lacks evidentiary support." <u>Molina v. Commonwealth</u>, 47 Va. App. 338, 368-69, 624 S.E.2d 83, 98 (2006).

Appellant offers <u>Christian v. Commonwealth</u>, 221 Va. 1078, 277 S.E.2d 205 (1981), to support his position. However, <u>Christian</u> is distinguishable on its facts. There, the defendant had sole custody of her six-month-old daughter until she sent the child to daycare on the morning of November 29, 1979. <u>See id.</u> at 1082, 277 S.E.2d at 208. A daycare worker discovered the child's injuries. <u>See id.</u> The Court stated that "where it appears that a criminal assault was made upon a child within a particular period of time, evidence which shows that the accused was sole custodian of the child during that period may be sufficient, standing alone, to prove criminal

agency." Id.  The Court concluded, however, that the evidence was insufficient to exclude a reasonable hypothesis that someone other than the defendant was the criminal agent because the evidence was uncontroverted that at least five people connected with the daycare center had access to the child from the time she left her mother until her injuries were discovered.  See id. at 1082-83, 277 S.E.2d at 208.

Here, the trial court determined appellant had sole custody and control of K.B. when the fatal injury occurred.  The evidence supports that finding.  K.B. was injured between 2:16 p.m., when Jones spoke to K.B. on the telephone during a work break, and 7:10 p.m., when Jones arrived home from work.  Appellant was K.B.'s caretaker during that time.  The trial court further found that in addition to having the opportunity to injure K.B., other incriminating circumstances, not present in Christian, established appellant as the criminal agent.

Appellant told Jones to lie about being at home all day with K.B., thus attempting to put the blame on Jones and deflect it from himself.  The court, however, rejected Jones' earlier statement that she had been at home with K.B.  Additionally, appellant asserted, based on Dr. Lamb's testimony that K.B.'s injuries could have occurred minutes before the paramedics arrived, that Jones could have harmed her son after she came home at 7:00 p.m. and then called 911, intending to incriminate appellant because she was angry with him.  However, K.B.'s poor medical condition was apparent to Jones as soon as she arrived at the apartment.

Appellant initially told Simmons he did not know how K.B. was injured.  Appellant later said he had left K.B. with his roommate when appellant went to the store and then speculated that "some guys" he saw in the hallway had "perhaps" entered the apartment and injured K.B.  Appellant told Simmons that when he returned from the store, K.B. was fine and showed no signs of abuse.  Medical testimony indicated that K.B.'s significant brain injury would have been noticeable immediately after it occurred, thus eliminating the roommate as the perpetrator.  Also,

when Jones spoke to appellant on the phone when she was leaving work at 5:00 p.m., appellant said K.B. was asleep and did not mention his roommate. The court reasonably rejected appellant's contention that his roommate might have been the perpetrator.

Further, appellant was distraught when he learned K.B. had died from his injuries. He then told Simmons he had "messed up," was "sorry," and wanted to explain to her and Jones what had happened.[3] While appellant never specifically confessed to inflicting the injuries, it is a reasonable inference that he was confessing to harming K.B. A trial court may make reasonable and justified inferences from the facts proved. Sullivan v. Commonwealth, 280 Va. 672, 676, 701 S.E.2d 61, 63-64 (2010).

Appellant also told both Simmons and Detective Baer that he would turn himself in to police, but, instead, after arranging to meet the detective, appellant fled the area and was later apprehended in New York City. See Covil v. Commonwealth, 268 Va. 692, 696, 604 S.E.2d 79, 82 (2004) (finding "[a] false or evasive account is a circumstance . . . the fact-finder may properly consider as evidence of guilty knowledge"); Black v. Commonwealth, 222 Va. 838, 842, 284 S.E.2d 608, 610 (1981) (holding that "the fact finder need not believe the accused's explanation and may infer that he is trying to conceal his guilt").

Thus, unlike Christian, the Commonwealth presented evidence that excluded both Jones and appellant's roommate as K.B.'s assailant and proved appellant had inflicted the injuries. See Burnette v. Commonwealth, 60 Va. App. 462, 476-78, 729 S.E.2d 740, 746-47 (2012) (holding evidence was sufficient to support defendant's conviction for felony child abuse, as fact finder was entitled to believe defendant's boyfriend's testimony that he had not injured child and then reasonably infer defendant had harmed child); Collado v. Commonwealth, 33 Va. App. 356,

---

[3] Even if the roommate had been in the apartment when K.B. was injured, appellant's statements implicating himself in the beating exclude Ryales as the perpetrator.

364-65, 533 S.E.2d 625, 629-30 (2000) (affirming defendant's conviction for child abuse where defendant was sole custodian of child during period when child suffered severe brain injury).

Defense counsel challenged Jones' credibility and emphasized that she had initially lied to investigators about being with K.B. during the day he was injured. However, "the credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear the evidence as it is presented." Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995); see Schneider v. Commonwealth, 230 Va. 379, 382, 337 S.E.2d 735, 736-37 (1985).

The trial court did not err in rejecting appellant's hypothesis of innocence.

> Properly understood, the reasonable-hypothesis principle is not a discrete rule unto itself. "The statement that circumstantial evidence must exclude every reasonable theory of innocence is simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt." [Commonwealth v. ] Hudson, 265 Va. [505,] 513, 578 S.E.2d [781,] 785 [(2003)]. Thus, the principle "does not add to the burden of proof placed upon the Commonwealth in a criminal case." Id. It merely echoes "the standard applicable to every criminal case." Cook v. Commonwealth, 226 Va. 427, 433, 309 S.E.2d 325, 329 (1983); see also Pease v. Commonwealth, 39 Va. App. 342, 360, 573 S.E.2d 272, 280 (2002) (*en banc*) (citation and internal quotation marks omitted), aff'd, 266 Va. 397, 588 S.E.2d 149 (2003) (*per curiam* order adopting reasoning of the Court of Appeals).

Vasquez v. Commonwealth, 291 Va. 232, 249-50, 781 S.E.2d 920, 930 (2016).

"Merely because defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded." Miles v. Commonwealth, 205 Va. 462, 467, 138 S.E.2d 22, 27 (1964). Indeed, "[b]y finding the defendant guilty, therefore, the fact finder 'has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.'" Haskins v. Commonwealth, 44 Va. App 1, 9, 602 S.E.2d 402, 406 (2004) (quoting United States v. Kemble, 197 F.2d 316, 320 (3d Cir. 1952)). "Whether an alternate hypothesis of innocence is reasonable

is a question of fact and, therefore, is binding on appeal unless plainly wrong." Wood v. Commonwealth, 57 Va. App. 286, 306, 701 S.E.2d 810, 819-20 (2010) (quoting Emerson v. Commonwealth, 43 Va. App. 263, 277, 597 S.E.2d 242, 249 (2004)); see Archer v. Commonwealth, 26 Va. App. 1, 9, 602 S.E.2d 402, 406 (2004) (holding that where the factfinder has rejected the hypothesis of innocence, "that determination cannot be overturned as arbitrary unless no rational factfinder would have come to that conclusion").

Unlike Christian, the trial court here was presented with evidence of opportunity "reinforced by other incriminating circumstances" to establish guilt beyond a reasonable doubt. Christian, 221 Va. at 1082, 277 S.E.2d at 208. Thus, we conclude the trial court did not err in rejecting appellant's theory of innocence. We affirm the two convictions.

Affirmed.