UNPUBLISHED

COURT OF APPEALS OF VIRGINIA


Present:   Judges Malveaux, Fulton and Friedman
Argued at Norfolk, Virginia


PATRICK AUSTIN CAROLINO

MEMORANDUM OPINION* BY
v.        Record No. 1270-21-1                      JUDGE FRANK K. FRIEDMAN
                                                    DECEMBER 29, 2022
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Leslie L. Lilley, Judge

Richard C. Clark, Senior Assistant Public Defender, for appellant.

Matthew J. Beyrau, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


This case involves an alleged physical attack at the end of a somewhat stormy romantic

relationship.  The appeal focuses on whether a prior alleged incident of physical abuse earlier in the

relationship was admissible and relevant to shed light on the later attack.  Patrick Austin Carolino

was convicted in the City of Virginia Beach Circuit Court on one count of strangulation, in violation

of Code § 18.2-51.6.  On appeal, Carolino argues that the trial court erred in admitting evidence

pertaining to a prior bad act that occurred between him and the victim, and he asserts that the

evidence was insufficient to prove the offense.

BACKGROUND

The Commonwealth's Evidence

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, the prevailing party at trial."  *Gerald v. Commonwealth*,

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)). "That principle requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom.'" *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (*en banc*) (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 254 (2003) (*en banc*)).

So viewed, the evidence established that Carolino and Hannah Ford were in a romantic relationship beginning in April 2018 and ending in May 2019. Carolino and Ford lived together from May 2018 until February 2019. On April 15, 2019, the two went out to dinner and began to argue. After dinner, Ford drove to the condo Carolino shared with a friend, Robert Mendez, and they both went to Carolino's bedroom. Ford was on the bed as they continued to argue, and she told Carolino she felt hopeless about their relationship. Carolino angrily got onto the bed with Ford and put his hand around her neck. With his other hand, Carolino pressed onto the back of her head "pushing it into the ground." Ford struggled to breathe and asked Carolino to stop. She thought she might pass out or die. As Carolino continued to apply pressure to Ford's neck, he asked, "do you see what it feels like to die?" Ford could not breathe for approximately fifteen to twenty-five seconds. She felt pressure in her head and had spotted vision, but she did not lose consciousness.

After the incident, Ford stayed with Carolino overnight and did not end their relationship. She did not report the incident to the police until a month later. Ford explained that she delayed reporting the strangulation to police because she still cared for Carolino. But she also "was scared to report anything."

The morning after the incident, Ford noticed that she had popped blood vessels in her eye and photographed her injuries. These photos were later introduced into evidence at trial. Ford also noticed that her neck was very tender and her throat was sore. She had difficulty swallowing, and her voice was affected. Ford went to work and discussed the incident with her manager, who

testified that on the day after the incident Ford was "visibly distraught" and her eyes were red "like the blood vessels had been popped." Her manager notified security at their workplace that there was a possibility someone might come by who could be a danger to them.

Mendez was Carolino's roommate between February and April of 2019. Mendez testified that, at the time of the incident, Ford's eyes "looked as if they were allergies or bloodshot, maybe a broken blood vessel." When he asked her about it, she told him she had allergies. Mendez also noted that Carolino told him, around this time frame, that Ford would know how to respond in self-defense if she were ever placed in a chokehold.

Ford ultimately reported the choking incident to Carolino's probation officer on May 17, 2019. She initially called to report him for violating his probation generally; however, after they met in person, Ford disclosed the choking incident.

Jennifer Knowlton, a sexual assault nurse examiner with Chesapeake Forensic Specialists, was qualified as an expert in "the signs and symptoms of strangulation." Knowlton testified that some of the typical signs and symptoms of strangulation are soreness in the neck area, pain or difficulty swallowing, and petechia and subconjunctival hemorrhages in the eyes. On cross-examination, Knowlton acknowledged that other things could cause such symptoms, such as reactions to medications, excessive coughing, and rubbing one's eyes to alleviate allergies. Knowlton did not personally treat Ford for her injuries.

Carolino's Version of Events and Attack on Ford's Credibility

After the Commonwealth rested its case, Carolino made a motion to strike, arguing that Ford's testimony was unreliable. Carolino pointed out that Ford waited a month before she reported the incident, and he asserted that she was biased because she was upset that Carolino was seeing other women. The trial court denied the motion to strike.

Carolino testified that on the night of the offense he and Ford argued about the fact that he was seeing other women. He explained that when they returned to his condo, she "begged" to come inside with him "one last time." Carolino stated that Ford spent the night, but he said they did not fight. Indeed, he testified that they had sex in the evening and again in the morning and then did yoga together. Carolino denied strangling Ford or putting her in a chokehold to teach her self-defense. Carolino said Ford continued to contact him after that night and tried to interfere with his other relationships. Carolino admitted that he had two prior felony convictions.

### The Whipping Incident

Carolino testified in his own defense and denied that the strangulation incident occurred. On cross-examination, he was asked:

> Q: Ms. Ford—have you ever—you said you didn't choke her. Have you ever been physical with her?
>
> A: Aggressively physical, no. Sexually, sure. Yes.
>
> Q: Okay. Never been aggressively physical with her?

The Commonwealth then cross-examined Carolino about a prior incident between him and Ford. Carolino explained that on a prior occasion, Ford had asked to be whipped as part of a sexual act. He stated: "I've never aggressively assaulted [Ford]. I've never—I've never done anything to [her] that she didn't ask me to do or did not want me to do."[1]

The Commonwealth then called Ford as a rebuttal witness. Over Carolino's objection, Ford testified that Carolino had beaten her with a belt in the summer of 2018 after learning that she had slept with someone else. Ford admitted multiple times that she told a detective that she "allowed" or "gave" "permission" to Carolino to administer the whipping. However, later, she testified that she did not, in fact, consent to the beating. Instead, Ford explained that she resigned herself to

---

[1] Carolino qualified this statement by noting that Ford sometimes accompanied him to a jiu-jitsu self-defense class where he showed her tactics in a physical context.

Carolino's insistence that he wanted to hurt her for her infidelity. Ford stated, "I did allow him. I was intimidated by him because he had expressed to me repeatedly that he wanted to hurt me. And I just . . . didn't want to have to wait and see when he was going to do it."

The Commonwealth, at trial and over objection, argued this evidence was admissible to impeach Carolino's credibility. In admitting the evidence the trial court stated: "He's just testified that he's never—he's never been physical with her. . . . I'm going to allow it. I'll overrule the objection." Also, over Carolino's objection, the trial court allowed the Commonwealth to introduce graphic photographs of injuries Ford sustained in the prior incident when Carolino whipped her.[2]

### The Trial Judge, as Fact-Finder, Convicts Carolino of Strangulation

After the defense rested, Carolino renewed his motion to strike and presented closing argument, again emphasizing that Ford waited over a month to report the choking incident to police and maintaining that she was not a credible witness. The trial court convicted Carolino of strangulation. In so ruling, the trial court specifically relied upon the prior bad act evidence as a central basis for the conviction. The court noted that this evidence "really had an impact on the court as far as credibility goes." This appeal followed.

### ANALYSIS

I. Evidence of Carolino's Prior Whipping of His Girlfriend was Inadmissible Solely to Impeach his Credibility

A. Standard of Review

Carolino asserts on appeal that the trial court erred both in allowing Ford to testify about the 2018 incident and in admitting photographs of her injuries from that beating. He contends that the evidence was irrelevant and inadmissible and that no exception to the rule against propensity evidence applied.

---

[2] The photographs were admitted as Commonwealth's Exhibit 2 and show large, dark bruises on Ford's buttocks and legs.

"Decisions regarding the admissibility of evidence 'lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion.'" *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019) (quoting *Michels v. Commonwealth*, 47 Va. App. 461, 465 (2006)).  To the extent an evidentiary ruling involves interpreting a statute or rule of court, such rulings are reviewed *de novo*.  *Brown v. Commonwealth*, 68 Va. App. 746, 792 (2018).  "Of course, an error of law, 'by definition,' constitutes an abuse of discretion."  *Bennett v. Commonwealth*, 69 Va. App. 475, 485 (2018) (quoting *Porter v. Commonwealth*, 276 Va. 203, 260 (2008)).

"As a general rule, evidence that shows or tends to show crimes or other bad acts committed by the accused is incompetent and inadmissible for the purpose of proving that the accused committed or likely committed the particular crime charged."  *Lafon v. Commonwealth*, 17 Va. App. 411, 417 (1993); *see* Va. R. Evid. 2:404(b).  "The policy underlying the exclusion of such evidence protects the accused against unfair prejudice resulting from the consideration of prior criminal conduct in determining guilt."  *Sutphin v. Commonwealth*, 1 Va. App. 241, 245 (1985). This general rule, however, "must sometimes yield to society's interest in the truth-finding process, and numerous exceptions allow evidence of prior misconduct whenever the legitimate probative value outweighs the incidental prejudice to the accused."  *Dunbar v. Commonwealth*, 29 Va. App. 387, 390 (1999).  Notwithstanding the general rule, evidence of prior bad acts is admissible:

> (1) to prove motive to commit the crime charged; (2) to establish guilty knowledge or to negate good faith; (3) to negate the possibility of mistake or accident; (4) to show the conduct and feeling of the accused toward his victim, or to establish their prior relations; (5) to prove opportunity; (6) to prove identity of the accused as the one who committed the crime where the prior criminal acts are so distinctive as to indicate a *modus operandi*; or (7) to demonstrate a common scheme or plan where the other crime or crimes constitute a part of a general scheme of which the crime charged is a part.

*Lafon*, 17 Va. App. at 417 (quoting *Sutphin*, 1 Va. App. at 245-46). This list "is not exclusive." *Lambert v. Commonwealth*, 70 Va. App. 740, 750 (2019).

Before prior bad acts evidence is admitted, the proponent of the evidence must illustrate that "the legitimate probative value" of the evidence "outweighs the incidental prejudice to the accused." *Pierce v. Commonwealth*, 50 Va. App. 609, 615 (2007) (quoting *Woodfin v. Commonwealth*, 236 Va. 89, 95 (1988)).

## B. *McGowan v. Commonwealth*, 274 Va. 689 (2007), and Impeaching the Accused's Credibility

Evidence must be relevant to be admissible. Va. R. Evid. 2:402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." Va. R. Evid. 2:401. Here, the Commonwealth, over Carolino's objection, introduced evidence of the whipping for the sole stated purpose of impugning Carolino's credibility after he stated on cross-examination that he was never "aggressively physical" toward Ford. The prosecution then called Ford in rebuttal to discuss the incident. Photos of Ford's extensive bruising resulting from the beating were also admitted.

On appeal Carolino asserts that, under *McGowan*, evidence of the whipping could not be introduced as a prior bad act simply to impugn his credibility. The Commonwealth counters that the evidence was properly accepted, but principally argues that the ruling to admit the evidence was "right for a different reason." *Vandyke v. Commonwealth*, 71 Va. App. 723, 731 (2020).

*McGowan* directly addresses whether a circuit court can admit prior bad acts evidence for the sole purpose of impugning the accused's credibility in response to an issue raised by the Commonwealth on cross-examination. In *McGowan*, a drug offense prosecution, the accused testified that at the time of the charged drug sale she "wouldn't know crack cocaine if [she] saw it." *McGowan*, 274 Va. at 693. To impeach the accused's credibility, the Commonwealth sought to introduce evidence that the defendant had *subsequently* been arrested in possession of crack

cocaine.  The Supreme Court found that the improper infusion of collateral "other crimes" evidence required reversal of the conviction.

The Court reasoned that collateral facts cannot be admitted into evidence and that "[t]he test as to whether a matter is material or collateral, in the matter of impeachment of a witness, is whether . . . the cross-examining party would be entitled to prove it in support of his case."  *Id.* at 695 (alterations in original) (quoting *Stottlemyer v. Ghramm*, 268 Va. 7, 12 (2004)).  The Court further cautioned:  "Evidence that relates to a separate offense for which the defendant is not currently standing trial, and which cannot be used for any purpose other than for impeachment of the defendant, is certainly collateral to the main issue."  *Id.*

The *McGowan* Court then reiterated that when a defendant is cross-examined on collateral matters, the prosecution must accept the answer provided and cannot introduce extrinsic evidence to contradict the accused:

> Under our jurisprudence . . . the cross-examiner is bound by the answer given, and cannot introduce any extrinsic evidence to otherwise contradict the witness.  Thus, "the answer of the witness will be conclusive; [she] cannot be asked as to any collateral independent fact merely with a view to contradict [her] afterwards by calling another witness."

*Id.* (second and third alterations in original) (citations omitted).  The Court confirmed that cross-examination regarding the collateral issue is permissible:

> [I]t is well settled that, "[e]very criminal defendant is privileged to testify in his own defense, or to refuse to do so.  But that privilege cannot be construed to include the right to commit perjury."  Clearly, a criminal defendant such as McGowan cannot expect to make a misleading statement to the jury without also "open[ing] the door to cross-examination for the purpose of attacking [her] credibility."

*Id.* (second, third, and fourth alterations in original) (first quoting *Harris v. New York*, 401 U.S. 222, 225 (1971); and then quoting *Santmier v. Commonwealth*, 217 Va. 318, 319-20 (1976)).

Under this governing law, we are left to determine whether the trial court properly admitted the rebuttal and extrinsic evidence relating to the 2018 whipping, and, if not, whether introduction of this evidence requires reversal.

C. Extrinsic Evidence of the Prior Whipping Incident was Impermissibly Admitted as a Collateral Matter in the Circuit Court

In examining the ruling below, we confront a situation where no basis was provided by the Commonwealth in the trial court for why the whipping evidence might have been admissible in its case-in-chief. The testimony—and the extrinsic photographs—were offered and admitted purely for impeachment purposes. After the Commonwealth argued that Carolino's credibility is "at the very core" of the case, the following colloquy occurred prior to the court admitting the photographs to discredit his statement, on cross-examination, that he was not "aggressively physical" with Ford:

> THE COURT: He said he had never been physical with her and I don't—and these pictures apparently—
>
> I haven't seen them yet. Is it your representation that this is evidence of him being physical with her?
>
> THE COMMONWEALTH: It is, Judge.
>
> THE COURT: Okay. I'll receive them.

After viewing the photos, the trial court, in convicting Carolino, specifically commented that this whipping evidence (and particularly the photos) "really had an impact on the court as far as credibility goes."

This case closely mirrors *McGowan*. We are guided by the Supreme Court's admonition that bad acts evidence which relates to a separate incident for which the defendant is not currently standing trial and which was not introduced "for any purpose other than impeachment of the defendant, is certainly collateral to the main issue." *McGowan*, 274 Va. at 695. Further, when impeaching on a collateral matter, "the cross-examiner is bound by the answer given, and cannot introduce any extrinsic evidence to otherwise contradict the witness." *Id.* Here, Carolino's

- 9 -

challenged testimony was impeached both by testimony from a rebuttal witness and by graphic, extrinsic photographs. Moreover, the trial court stated that this improper evidence was essentially the tipping point in reaching its ultimate decision.[3]

Under these circumstances, we find that the trial court ran afoul of *McGowan* in admitting this propensity evidence for the sole purpose of attacking Carolino's credibility. This, however, does not end our inquiry. We next address the Commonwealth's vigorous contention that we should uphold the admission of the evidence—and therefore the conviction—on alternate grounds.

## II. The Commonwealth's Reliance on Alternative Grounds

The Commonwealth asserts that the disputed evidence could have been admitted—and the conviction upheld—under different reasoning than the trial court applied.[4] "We have long said that '[w]e do not hesitate, in a proper case, where the correct conclusion has been reached but the wrong reason given, to sustain the result and assign the right ground.'" *Banks v. Commonwealth*, 280 Va. 612, 617 (2010) (alteration in original) (quoting *Eason v. Eason*, 204 Va. 347, 352 (1963)). On appeal the Commonwealth offers a broad array of explanations for why the whipping incident could have been relevant in its case-in-chief had these explanations been raised in the trial court—ranging from showing intent, consent, or "state of mind," to proving "the dysfunction" of the couple's

---

[3] The Commonwealth's argument on appeal that the whipping incident itself may have been probative evidence in its case-in-chief will be addressed, *infra*. The graphic photos, however, raise different considerations than the testimony regarding the events surrounding the alleged incident—and the Commonwealth offers little basis for how introduction of the photos would have been permissible in its case-in-chief.

[4] The Commonwealth espouses the "right-for-a-different-reason" doctrine as a means of preserving the verdict. This theory is applicable in cases "where the appellate court expresses no view on the correctness of the lower court's rationale." *Vandyke*, 71 Va. App. at 731. We have addressed the lower court's rationale—specifically, its finding that the whipping evidence was admissible to impeach Carolino's credibility—and therefore instead apply the "right-for-the-wrong-reason" test, which is closely aligned to the Commonwealth's argument. *See Perry v. Commonwealth*, 280 Va. 572, 580 (2010); *Haynes v. Haggerty*, 291 Va. 301, 305 (2016).

relationship or explaining why Ford "did what she did." The Commonwealth similarly argues the whipping evidence demonstrates the defendant's "conduct or attitude" toward the victim, as well as the nature of their relationship. *See Ortiz v. Commonwealth*, 276 Va. 705, 714 (2008); *Morse v. Commonwealth*, 17 Va. App. 627, 632 (1994) (evidence of prior acts of sexual violence was admissible to show "the conduct and feeling of the accused toward the victim and the prior relations between the parties" in a prosecution for marital sexual assault).[5]

The prior acts in the cases relied upon by the Commonwealth, however, were proven to be relevant to the newly charged acts in some meaningful or probative manner. *See Guill v. Commonwealth*, 255 Va. 134, 140-41 (1998) (evidence of other acts must address a matter genuinely in dispute). The Commonwealth's contention, here, that the incident reveals "dysfunction" in the relationship suggests that any incident in the relationship is relevant simply as background information. The prosecution, however, must establish some evidentiary connection or legitimate probative value to the whipping evidence before it becomes admissible. Here, the Commonwealth fails to provide a persuasive probative link. For example, the Commonwealth's speculative suggestion that the whipping incident reveals motive or intent—that Carolino was still angry about Ford's infidelity the prior summer—is inconsistent with the record which reveals that Carolino was seeing other women on the date of the alleged choking incident, was not interested in an "exclusive" relationship, and was not dwelling on past "infidelities." Further, the Commonwealth's argument that the whipping incident was relevant to establish "consent" or state of mind is also problematic because the issue on this record is not whether the strangulation was consensual—an argument which no one asserted—but whether a strangulation actually occurred.

---

[5] *See also Burnette v. Commonwealth*, 60 Va. App. 462, 480 (2012) (evidence of a baby's prior injuries was relevant and admissible to show the defendant's "prior relationship with and feelings toward" the infant); *Conley v. Commonwealth*, 74 Va. App. 658, 672 (2022) (video evidence of prior incidents of sexual abuse was admissible to show the defendant's "conduct and attitude" toward the victim).

Ford claimed that she was strangled—and Carolino flatly denied the claim and challenged Ford's credibility in multiple respects.[6]

Recognizing that Ford's credibility was hotly disputed, the Commonwealth suggests that the whipping incident is relevant to show why Ford "did what she did." In essence, the prosecution argues that the delayed reporting of the whipping sheds light on her delayed reporting of the alleged choking. Again, the record does not bolster this theory because: (1) two incidents occurring many months apart do not necessarily establish a "pattern," and (2) Ford's reporting as to the two incidents was inconsistent in various significant respects. For example, Ford immediately reported the alleged strangulation to her employer the following day, although she delayed reporting it to Carolino's probation officer. By contrast, there is no evidence she discussed the whipping with anyone at the time it occurred. She never made claims that the strangulation was consensual[7]; but she did tell police the whipping was consensual:

> Q. And didn't you tell the officer that you sort of gave him permission [for the whipping]?
>
> A. I did tell her that.
>
>      . . . .
>
> THE COURT: You have to – you have to speak up.
>
> THE WITNESS: Yes. I told her that I had allowed him to do it.

Indeed, the two incidents are fairly dissimilar except to suggest Carolino's alleged propensity to physical aggression. Notably, even without the whipping evidence, Ford was permitted to explain

---

[6] For example, Carolino argues that Ford contacted his probation officer twice without mentioning the strangulation and that she waited over a month to report the incident to police. He points out that Ford spent the night with him after the incident and that she told Mendez that her eyes were red from allergies the next morning.

[7] The dissent's suggestion that "Carolino's testimony implied that any strangulation would have been consensual" is not supported by the record. He denied the incident occurred.

her delayed reporting of the alleged strangulation as attributable to her lingering feelings for Carolino and her fear of reprisal. The Commonwealth's theory of relevance as to Ford's "delayed reporting" of the whipping or "state of mind" is attenuated and offers negligible probative value, if any.[8]

The Commonwealth's difficulty in establishing an alternate basis for admitting the testimony regarding the whipping incident only increases with respect to admission of the graphic photos depicting the extensive bruising Ford suffered from the whipping. The Commonwealth offers virtually no explanation for why the post-whipping photos of Ford's injuries should have been admissible other than to corroborate that the incident occurred. The "happening" of the beating does not require corroboration, however, as no one disputes that it occurred.

Finally, the test for admissibility of bad acts evidence is tempered by the requirement that the evidence's probative value must outweigh any unfair prejudicial impact. *See Kenner v. Commonwealth*, 299 Va. 414, 427 (2021) (to admit bad acts evidence, "the legitimate probative value of the evidence must exceed its incidental prejudice to the defendant"). The photographs depicting Ford's injuries are disturbing. Prior bad acts evidence will often be prejudicial to the defendant, but the test is whether the evidence is unfairly so. *Lee v. Spoden*, 290 Va. 235, 251-52 (2015). "'[U]nfair prejudice' refers to the tendency of some proof to inflame the passions of the trier of fact, or to invite decision based upon a factor unrelated to the elements of the claims and defenses in the pending case." *Id.* at 251. Here, the photos were jarring and inflammatory, and they were introduced improperly. *See McGowan*, 274 Va. at 695 (rejecting tactic of impugning accused's cross-examination testimony on collateral matters with extrinsic evidence). Ultimately,

---

[8] Moreover, the Commonwealth relies on the premise that the whipping evidence is admissible for a limited permissible purpose—but we know this hypothetical justification does not accurately portray how the evidence was actually used. The evidence was not introduced by the Commonwealth for the limited purpose of explaining Ford's delayed reporting or her state of mind.

the unfair prejudicial impact of the bad acts evidence substantially outweighed any remote probative value the evidence may have had, and the bad acts evidence should have been excluded. *See, e.g.*, *Lambert*, 70 Va. App. at 745 (evidence properly excluded where it would have minimal probative value yet significant potential for confusion and undue prejudice); *Pryor v. Commonwealth*, 276 Va. 312, 316-17 (2008) (evidence excluded where its prejudicial impact greatly exceeds its probative value); *Old Chief v. United States*, 519 U.S. 172, 191 (1997) (reversing conviction based on improper admission of bad acts evidence where "the risk of unfair prejudice did substantially outweigh the discounted probative value" of the evidence).

### III. We Cannot Say the Error Was Harmless

For many of the same reasons that we find the extrinsic whipping evidence was improperly admitted, we reject any notion that the error was harmless. We *know* that the fact-finder relied on the collateral evidence. The fact-finder specifically indicated that the extrinsic photos tipped the scales against the accused, stating, "it really had an impact on the court as far as credibility goes."[9] *See, e.g.*, *Commonwealth v. Swann*, 290 Va. 194, 201 (2015) (holding that improperly-admitted hearsay evidence was not harmless error because the Supreme Court could not "say with fair assurance that the jury was not substantially influenced" by the evidence); *Jennings v. Commonwealth*, 65 Va. App. 669, 681 (2015) (finding that error was not harmless where the erroneously-admitted testimony established an essential element of the charged offenses). Given our knowledge that the error directly affected the verdict, we cannot conclude that the error was harmless. To the contrary, by the fact-finder's own account, it had a

---

[9] We are cognizant that in a bench trial we can presume that the court relied upon challenged evidence for a proper purpose, unless the record provides otherwise. *Castillo v. Commonwealth*, 21 Va. App. 482, 491-92 (1995); *Wilson v. Commonwealth*, 16 Va. App. 213, 223 (1993). Here, the record reveals that the improper evidence was considered improperly under *McGowan* and it did affect the verdict.

significant impact on the verdict and necessitates a retrial. Thus, we reverse Carolino's conviction.[10]

## CONCLUSION

This case falls squarely within the holding of the Supreme Court's *McGowan* decision. We rule that, under *McGowan*, the trial court erred in admitting prior bad acts evidence in rebuttal solely to impeach Carolino's credibility regarding issues raised by the Commonwealth on cross-examination of the accused. We cannot uphold the conviction under the right-for-the-wrong-reason doctrine. The Commonwealth has failed to present alternate grounds to support admission of the whipping incident; moreover, the disputed evidence was substantially more prejudicial than probative. Finally, the record reveals a strong probability that the error below did affect and taint the verdict below. Thus, we reject claims that the error could be deemed harmless. Accordingly, we reverse the judgment of the trial court and remand the case for a new trial, if the Commonwealth be so advised.

*Reversed and remanded.*

---

[10] We note that "[w]hen a reviewing court reverses an appellant's conviction, it must also address the appellant's challenge to the sufficiency of the evidence underlying that conviction 'to ensure that a retrial on remand will not violate double jeopardy principles.'" *Barney v. Commonwealth*, 73 Va. App. 599, 612 (2021) (quoting *Wilder v. Commonwealth*, 55 Va. App. 579, 594 (2010)). Here, Carolino has not demonstrated that the evidence is insufficient to support a conviction on remand. A retrial is the appropriate remedy, and this outcome poses no double jeopardy concerns going forward.

- 15 -

Fulton, J., concurring in part, and dissenting in part.

I respectfully dissent from the majority's conclusion that the trial court erred in admitting the evidence of the whipping incident. I would hold that the evidence of the 2018 whipping incident was a prior bad act admissible in the Commonwealth's case-in-chief as evidence of the nature of the relationship between Carolino and Ford, to prove lack of consent to the strangulation, and to explain Ford's delayed report of the strangulation. Accordingly, it is not "collateral to the main issue," *McGowan v. Commonwealth*, 274 Va. 689, 695 (2007), and was properly admitted into evidence at trial.

## ANALYSIS

Carolino asserts on appeal that the trial court erred in allowing Ford to testify about the 2018 incident and in admitting photographs of her injuries from that time. He contends that the evidence was irrelevant and inadmissible to prove a prior bad act and that no exception to the rule against propensity evidence applied. I disagree; evidence of the prior whipping was relevant to show "the conduct or attitude of the accused toward his victim," as well as the nature of the "the relationship between the parties." *Moore v. Commonwealth*, 222 Va. 72, 76 (1981). The whipping evidence, therefore, was not collateral to this case.

"Decisions regarding the admissibility of evidence 'lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion.'" *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019) (quoting *Michels v. Commonwealth*, 47 Va. App. 461, 465 (2006)). "Of course, an error of law, 'by definition,' constitutes an abuse of discretion." *Bennett v. Commonwealth*, 69 Va. App. 475, 485 (2018) (quoting *Porter v. Commonwealth*, 276 Va. 203, 260 (2008)). "In conducting *de novo* review of a legal issue, the appellate court defers to any factual findings underpinning it, including the credibility of the witnesses, and may reverse them only if they are plainly wrong." *Id.* "Only when reasonable jurists could not differ can we say

- 16 -

an abuse of discretion has occurred." *Nottingham v. Commonwealth*, 73 Va. App. 221, 231 (2021) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).

"Generally, evidence of an accused's other criminal acts is 'inadmissible to prove guilt of the crime for which the accused is on trial.'" *Kenner v. Commonwealth*, 71 Va. App. 279, 289 (2019) (quoting *Gonzales v. Commonwealth*, 45 Va. App. 375, 380 (2005) (*en banc*)), *aff'd*, 299 Va. 414 (2021). "The policy underlying the exclusion of such evidence protects the accused against unfair prejudice resulting from the consideration of prior criminal conduct in determining guilt." *Id.* (quoting *Sutphin v. Commonwealth*, 1 Va. App. 241, 245 (1985)). Nevertheless, "other crimes evidence is admissible when it 'shows the conduct or attitude of the accused toward his victim[;] establishes the relationship between the parties[;] or negates the possibility of accident or mistake,' or shows motive, method, intent, plan or scheme, or any other relevant element of the offense on trial." *Ortiz v. Commonwealth*, 276 Va. 705, 714 (2008) (alterations in original) (quoting *Moore v. Commonwealth*, 222 Va. 72, 76 (1981)); *see also* Va. R. Evid. 2:404(b) (evidence of "other crimes" is admissible when "relevant to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, accident, or if they are part of a common scheme or plan"). This list "is not exclusive." *Lambert v. Commonwealth*, 70 Va. App. 740, 750 (2019). "Virginia law 'follows an "inclusionary approach" to the uncharged misconduct doctrine by admitting such evidence "if relevant, for *any purpose* other than to show a mere propensity or disposition on the part of the defendant to commit the crime."'" *Id.* (emphasis added) (quoting *Castillo v. Commonwealth*, 70 Va. App. 394, 415 (2019)). The test is whether "the legitimate probative value" of the evidence "outweighs the incidental prejudice to the accused." *Pierce v. Commonwealth*, 50 Va. App. 609, 615 (2007) (quoting *Woodfin v. Commonwealth*, 236 Va. 89, 95 (1988)).

The evidence that Ford had acquiesced to a beating so severe as to result in the injuries reflected in the photos, and yet remained in a relationship with Carolino, sheds significant light on

the nature of the relationship between the parties and was relevant to explain Ford's delay in reporting the incident to the police and also why she told Mendez the redness in her eyes resulted from allergies. She was afraid of and intimidated by Carolino due to the nature of their abusive relationship. This evidence helps explain Ford's delayed report, her explanation to Mendez about the petechia in her eyes, her initial complaint to Carolino's probation officer, and her decision to spend the night in the company of the man who had just strangled her. *See Scott v. Commonwealth*, 228 Va. 519, 527 (1984) (wife's submission to husband's sexual demands in marital rape case could bear upon the defense of consent and, thus, "the prior relations of the couple showed the victim's state of mind 'as to why she did what she did'"). Thus, the evidence was relevant to show the nature of the relationship and Ford's tendency to respond to Carolino's aggression with resigned submission. As the trial court surmised, "It was punishment for some act that she did. I guess that's where the complexities of the relationships [sic] come in . . . . Inexplicable circumstances where they can't be disputed."

Moreover, Ford's explanation for why she capitulated to Carolino's whipping bore upon the element of consent to the strangulation. *See Morse v. Commonwealth*, 17 Va. App. 627, 632 (1994). Carolino admitted that he was sexually aggressive with Ford and said Ford *asked* him to whip her. Carolino's testimony implied that any strangulation would have been consensual. The prior bad acts evidence was also relevant as the Commonwealth was required to prove that Carolino, "without consent," impeded Ford's "blood circulation or respiration" by "knowingly, intentionally, and unlawfully applying pressure to [her] neck." Code § 18.2-51.6. At trial, Carolino denied strangling Ford and explained that, although they argued at dinner, they did not fight when they returned to his condo and, instead, stayed together "for the entirety of the night and up to two to three hours the following morning." Carolino's testimony differed materially from Ford's testimony, and he called her version of events into account. Therefore, the Commonwealth's

- 18 -

inquiry as to whether Carolino had ever been physically aggressive with Ford, along with the photographs of Ford's injuries from the 2018 incident, were relevant and admissible to prove Carolino's "conduct or attitude" toward Ford, the acrimonious nature of their relationship, and the non-consensual characteristic of the April 2019 encounter.

Furthermore, the 2018 whipping incident was not so remote in time as to negate its probative value. Ford and Carolino started dating in April 2018 and lived together for less than a year before finally breaking up in May 2019. The prior incident occurred in the summer of 2018, near the beginning of their relationship, and the strangulation occurred in April 2019, near the end of their relationship. Thus, the prior incident was less than a year old at the time of the instant offense and not so remote in time as to render the evidence nonprobative of Carolino's conduct and attitude toward Ford, or the acrimonious nature of their relationship. Further, remoteness alone would not "render such evidence incompetent," where the act was accomplished in a "comparatively recent period" and was "apparently inspired by one purpose." *Ortiz*, 276 Va. at 714-15 (quoting *Moore*, 222 Va. at 77).

Finally, having determined the relevancy of the prior bad acts evidence, we now consider whether their legitimate probative value outweighs their prejudicial effect. Va. R. Evid. 2:404(b); *Kenner*, 299 Va. at 427. "The responsibility for balancing the two considerations rests in the trial court's discretion and we will not disturb the court's determination in the absence of a clear abuse of discretion." *Kenner*, 299 Va. at 427. "[R]elevant evidence will only be excluded if its prejudicial nature *substantially* outweighs its probative value." *Conley v. Commonwealth*, 74 Va. App. 658, 673 (2022). In order to be considered unfairly prejudicial and subject to exclusion, "the nature of the evidence must be such that it creates such a strong *emotional* response that it is unlikely that the [fact finder] could make a *rational* evaluation of its proper evidentiary weight." *Fields v. Commonwealth*, 73 Va. App. 652, 673 (2021). The fact finder in this case was the trial judge.

- 19 -

[A] trial judge, sitting as the fact finder in a bench trial, "is uniquely suited by training, experience and judicial discipline to disregard potentially prejudicial comments." As a result, we presume that a trial judge has "separate[d], during the mental process of adjudication, the admissible from the inadmissible, even though he has heard both."

*Adjei v. Commonwealth*, 63 Va. App. 727, 739 (2014) (second alteration in original) (quoting

*Lebron v. Commonwealth*, 58 Va. App. 540, 551 (2011)). The photographs depicting Ford's

injuries, though disturbing, are neither gory nor graphic. Particularly whereas they were considered

only by a judge sitting as the fact finder, we do not find them so inflammatory as to outweigh their

probative value to the Commonwealth's case.

Ford's testimony, and the corroborating photographs, of the whipping incident were also

relevant to impeach Carolino's denial that he had ever been physically aggressive with her.

"Evidence that relates to a separate offense for which the defendant is not currently standing trial,

and which cannot be used for any purpose other than for impeachment of the defendant, is . . .

collateral to the main issue" in the case and thus is inadmissible. *McGowan*, 274 Va. at 695; *see*

*also Bunting v. Commonwealth*, 208 Va. 309, 314 (1967) ("Evidence of collateral facts or those

incapable of affording any reasonable presumption or inference on matters in issue, because too

remote or irrelevant, cannot be accepted i[nto] evidence."). I disagree with the majority's

conclusion that the prior bad acts evidence was collateral to the strangulation charge for which

Carolino was on trial. On the contrary, it was admissible in the Commonwealth's case-in-chief to

prove the nature of the relationship between Ford and Carolino, the lack of consent, and to explain

the one-month delay in reporting the strangulation. Because the prior bad acts evidence was not

collateral, it was permissible for the Commonwealth to use extrinsic evidence of those acts to impeach Carolino's credibility.[11]

In sum, because the evidence pertaining to Carolino's prior bad act toward Ford was relevant and admissible, and because its probative value outweighed any prejudice to the accused, the trial court did not abuse its discretion in admitting it at trial.

### CONCLUSION

I would hold that the trial court did not abuse its discretion in admitting the evidence of the prior bad act in this case, as that evidence was relevant to prove Carolino's attitude and conduct toward Ford, the nature of their relationship, the nonconsensual nature of the offense, and to explain the delayed report. I concur with the majority that the evidence presented at trial was sufficient to support the conviction.

---

[11] Because I conclude that the whipping evidence is not "collateral," *McGowan* does not preclude its use for impeachment. Thus, the "right-for-the-wrong-reason doctrine" need not be considered.